ROBERT WILLIAM NICHOLS *v.* STATE
OF MARYLAND

[No. 29, September Term, 1968.]

342

*Decided November 13, 1968.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Sidney Blum* and *Eugene A. Alexander, III,* for appellant.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Clewell Howell, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

This case comes to us on appeal from judgments entered by the Circuit Court for Baltimore County upon the convictions of Robert William Nichols by the court without a jury of assault upon Seymour Robert Goldstein (2nd count of indictment 32224), upon his wife, Ann Goldstein (2nd count of indictment 32226) and upon his children, Mark Goldstein (2nd count of indictment 32225) and Sheril Goldstein (2nd count of indictment 32227) and of the unlawful use of a telephone proscribed by Md. Code, (1967 Repl. Vol.), Art. 27, § 555A (4th count of indictment 32224). The appellant was sentenced to imprisonment for a term of 5 years on the conviction under the 2nd count of indictment 32224 and sentence on each of the

other convictions was suspended generally. The sole contention on appeal goes to the sufficiency of the evidence to sustain the convictions.[1] The appellant claims that the evidence was circumstantial and, therefore, in order to justify the verdicts of guilty it must not only meet the ordinary test of sufficiency but also the circumstances, taken together, must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence. He asserts that the evidence, so tested, was insufficient.

## THE ASSAULT CONVICTIONS

The evidence adduced at the trial clearly proved the *corpus delicti* of each of the assault offenses. It showed that the Goldstein residence, occupied at the time by Mr. and Mrs. Goldstein and their two children, was fired upon about 4:00 A.M. on 30 October 1966. Goldstein testified:

> "My home was shot up by a rifle, the bullet entering my child, Mark's room right above his bed; another bullet entering the side wall of the house above my baby's crib, Sheril, my daughter, and another bullet entered our bedroom wall, side wall, and lodged into the dresser right next to our bed."

Photographs showing the rooms and the damage were received in evidence. Goldstein heard three shots. No one was seriously injured "except for the plaster that fell on my daughter, and some of the glass was on my son, because the glass from the window came in all over him." The trial judge said: "There is

---

1. Prior to 1 January 1950 the law did not permit appellate review of facts. *Abbott v. State,* 188 Md. 310, 313. See *Jones v. State,* 188 Md. 263, 273; *League v. State,* 36 Md. 257. Compare *Winkler v. State,* 194 Md. 1. Criminal Rule 7(c), effective that date, (in substance the same as present Md. Rules 1086 and 886a) provided that when a case has been tried by the lower court without a jury, the Court of Appeals will review it both on the law and the evidence. This antedated the amendment to Art. XV, § 5 of the Constitution of Maryland by almost a year. The constitutional provision as amended, implemented by statute (now Art. 27, § 593) and rule (now Md. Rule 755) permits appellate review of the sufficiency of the evidence in a case tried by a jury predicated upon the denial by the lower court of a motion for judgment of acquittal.

one piece of incontrovertible evidence in this case, and that is at some time around 4:00 A.M. on the morning of October 30th, 1966, someone fired three bullets from some weapon into the home of Goldstein." He also found as a fact, from the evidence, that Mr. and Mrs. Goldstein and their two children, as named in the indictment, were in the home at the time.

The question is, therefore, whether the evidence was sufficient to show the criminal agency of the appellant. The testimony of Goldstein was that he was an attorney and had represented the appellant's wife, Yvonne Nichols, at the time employed by him as a secretary, in a domestic relations matter "for child support and divorce," in 1965 and 1966. Around the end of August 1966 or the first part of September the appellant drove to Goldstein's office on a motorcycle, and told Goldstein that he should fire Mrs. Nichols, "that I should tell her to run and take the children out of town because he was going to take the children from her, and that he was tired of fooling around with this, and he wasn't going to pay any more money for his children's support, that he was going to handle this matter himself if it didn't get rectified. He told me that if I didn't get out of this case and I didn't fire her, throw her out in the street, that he was going to get me, that he would pick me off with a rifle." About 3:00 A. M. on 30 October 1966 a phone call was received in the Goldstein residence. Mrs. Goldstein answered the phone and referred the call to her husband. Goldstein recounted the conversation:

> "As I took the phone, he said, 'This is sweet Bobby,' and I recognized his voice immediately, and I said, 'I don't know any sweet Bobby. Who do you mean sweet Bobby?' He said, 'You know who I mean. This is sweet Bobby.' I said, 'I don't know who you are.' He said, 'This is Vonnie's husband, Robert Nichols, and I am going to tell you something. You either fire her and get out of this case or I am going to get you. I am getting tired of fooling around with this thing in court. I am going to pick you off with a high-powered rifle. I haven't had an opportunity because I work on the state roads on the Eastern Shore and during the summer I am down there. I can't get up here much,

> but during the winter I can get up here, and it's going to be a long winter.' And I told him, 'Look, you have an attorney, you discuss these things with him. I don't want to hear this at my home at 3:00 o'clock in the morning,' and then he got abusive and he hung up."

He identified the appellant as the caller. "I have heard his voice numerous times in court. He has called my office and I have spoken to him on the phone there." See *McGuire v. State,* 200 Md. 601; *Lenoir v. State,* 197 Md. 495. Goldstein called the police, Officer C. Mathis responded to the call, and Goldstein reported the incident to him. About one hour later the home was fired upon. Goldstein heard "a roar of a motor which was very similar to either a souped-up automobile or a motorcycle, but a very loud muffler outside pulling away, very similar to a cut-out muffler or sports car type of an automobile." This incident was reported to the police and officer Mathis returned about 4:40 A.M. to investigate the shooting.

The appellant's wife testified that in June or July 1966 about 2:00 or 3:00 o'clock in the morning she received a phone call from her husband. She was separated from him at the time and in the process of obtaining a divorce. "When Bobby called me, he told me that—at first there was idle conversation, and he told me later that to tell Mr. Goldstein to fire me, and I asked him why he said that, and he just said, 'Just tell him to fire you.' He said that he knew where he lived, and I said, 'Well, what does that have to do with it?' and he said, 'I can sit on any hill out there and pick him off with a rifle any time I want to.' "

Mrs. Alma T. Lane, the mother-in-law of the appellant, testified that "a couple of weeks" after the shooting she was in a cocktail lounge at which she was to meet her husband when the appellant came in. She told him she was surprised that he was out of jail and he laughed and said, "Well can't keep me in jail long." They "got to talking about my daughter and the children." "I said I was worried about my daughter and grandchildren, their safety, and he said, 'You never have to worry about Bobby and the children, I wouldn't hurt them, but that

bastard, Goldstein, I am not finished with him yet. I am still going to get him.' I said, 'Bobby, why don't you leave the man alone, he has never hurt you?' He said, 'Well, you just don't worry about it. You leave it to me.' So we discussed a few more things, and that was it."

Evidence was offered by the appellant. His father testified that the appellant had come home from the Eastern Shore about 10:00 or 11:00 P.M. on 29 October and left about 11:30 P.M. He did not see him again until the next evening. His son owned a motorcycle but did not take it out that night. The motorcycle was kept in a garage under the house and was still there the following day. He did not like motorcycles, was very conscious of the noise they make and he would have known had his son taken it out. He did not know of any rifle owned by his son although he had "a single bolt shotgun." Gloria Lenick testified that she was a barmaid at "Denny's" on Eastern Avenue and saw the appellant about midnight on 29 October. He met a girl named Kitty and drank with her until closing time at 2:00 A.M. "He was plastered, he was actually stupid drunk. * * * he wasn't able to walk." A cab was called—"at 2:00 o'clock, we usually try to get them out as fast as we can, and if they are not able to drive, if we see they are not able to drive, we call a cab, and somebody else in the bar called a cab, and we waited for the cab to come." Kitty and some other person helped him out to the cab. On question by the court it appeared that she was not sure that she had seen the appellant on a Friday or Saturday night but it was "on the weekend."

Kitty, Patricia Ann Lyons, testified that she had known the appellant "around two years." She met him at Denny's about midnight on 29 October. "We stayed there and danced, and drank, and we talked to a few people, and when they closed we got a cab and went home. * * * when we left there, he was pretty drunk." It was a new Eastern cab. They went to her apartment arriving "around 2:30, quarter to 3:00. I am not too sure." She put him on a couch and he went to sleep. She fixed herself some breakfast, read the paper and went to bed about 4:00 A.M. The next morning the appellant was still on the couch when she woke him up about 11:00 A.M. He did not use the phone during the time he was there and if he had left

the apartment she would have known it because her dog would have barked. It was later brought out that she was pregnant at the time and that she could not say for sure that the appellant was the father of the child but he could have been.

An automobile mechanic testified that an automobile belonging to the appellant was in his garage in October 1966 and that the appellant had not gotten it until after noon on 30 October. The car did not have any unusual mufflers.

The appellant testified that on 29 October 1966 he was working for the State Roads Commission on the Eastern Shore. He finished work about 5:30 or 6:00 P.M. and came to Baltimore by bus. He went to his parents' home and later went out for the evening. "I went down to Eastern Avenue, I always go down to Eastern Avenue, I always do on Saturday nights, and I took a cab down." He met Kitty and "we just drank and danced * * * usually on Saturday nights I get pretty well loaded." Finally Kitty told him it was time to go and "we got in a taxi * * * we got to her place, and I fell asleep, and that is all I know." He said he did not use an automobile that night, did not use his motorcycle that night and did not own "a high-powered rifle." He found out Sunday that the police were looking for him, called his attorney and arrangements were made to surrender him to the police at a hearing before the "Master at Chancery" the next morning. He denied that he had ever telephoned Goldstein "at his office or anywhere else," that he had ever gone to Goldstein's office to see him or see Mrs. Nichols after he had employed counsel in the domestic matter in January 1966, that he had ever told his wife or her mother that he was going to injure Goldstein or wanted to injure him or intended to injure him, or that he had met his mother-in-law in the cocktail lounge as she had alleged. He had once assaulted his wife when he "caught her with this fellow" and had been in jail for violation of the motor vehicle laws in February 1963—operating with a revoked license and making a false affidavit to obtain a license. On cross-examination he admitted that he had been convicted of "a couple of assaults, and I had been in a couple of fights."

Additional testimony was offered by the State in rebuttal relating to the cab alleged to have transported the appellant and

Kitty from Denny's to her apartment. The secretary of the cab company, charged with the responsibility of keeping its books and records testified that the records showed that a call was received for a cab at 1:46 A.M. on 30 October from Denny's Bar. Cab No. 5 responded. It also had a call at 41 Langley Road at 2:20 A.M. and at 63 Oliver Road at 2:35 A.M. The manifests did not indicate any other calls at Denny's Bar around those times. The driver of cab No. 5 did not remember if he had responded to the job assigned to him on the 1:46 A.M. call. It was not recorded in his manifest but at the time his wife "was very, very ill * * * my mind wasn't on my work at all * * * I probably just didn't put it down" but "I never refuse a call."

The test of legal sufficiency of evidence was enunciated in the Memorandum on Motion for Reargument in *Edwards v. State*, 198 Md. 132, 157-158:

> "In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved. In a civil case the fact must be shown, or the inference supported, by a preponderance of probability or an opposite preponderance must be overcome. In a criminal case the fact must be shown, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. The difference in degree of proof is ordinarily for the triers of facts."

In *Vincent v. State*, 220 Md. 232, 237, the Court restated the rule as to criminal cases:

> "In every criminal case, evidence, to meet the test of legal sufficiency, must show directly, or support a rational inference of, the facts required to be proved; and the facts must be established, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created."

The appellant contends that this test is not by itself applicable to the evidence in the instant case but, as the evidence against

him was circumstantial, must be considered along with the test relating to evidence of that character. In the opinion in *Edwards* the Court did not discuss circumstantial evidence. In the motion for reargument it was asserted by counsel for Edwards that the "most important single contention * * * was that the evidence, being entirely circumstantial, did not exclude to a moral certainty every other reasonable hypothesis than that of guilt. * * * this is the first time the question has been squarely presented to this court and it was hoped that the court would adopt or reject the rules which have been followed in other jurisdictions for many years. But it appears that the court has failed to give the question any consideration whatever. * * * The court's opinion becomes authority for the proposition that Maryland has no definite rules for the appraisal of circumstantial evidence * * *." 198 Md. at 152. In the Memorandum on the Motion the Court said, 198 Md. at 157:

> "If we assume that circumstantial evidence, or all the evidence of any kind, must 'exclude to a moral certainty every other reasonable hypothesis than that of guilt', this assumption does not change the result in the instant case—and does not furnish any 'definite rule for the appraisal of circumstantial evidence.' "

In *Shelton v. State,* 198 Md. 405, 412 the Court again stated the test of legal sufficiency enunciated in *Edwards* and added: "Before a verdict of guilty is justified, the circumstances, taken together, must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence." But in *Vincent v. State, supra,* 236-237, the Court made clear that it is only "when guilt is based solely upon circumstantial evidence, the circumstances, taken together, must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence." In *Brown v. State,* 222 Md. 290, 296 the Court said the Maryland rule was correctly stated in *Vincent* but emphasized "solely" and "reasonable".[2] See *Glaros v. State,* 223 Md. 272, 281.

---

2. Compare *United States v. Ragland,* 306 F. 2d 732 (4th Cir., 1962), cert. denied 83 S. Ct. 504, in which the Court, noting that the Government relied on circumstantial evidence, said, "[W]hich

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. It is admissible whenever relevant to the determination of guilt or innocence and great latitude is allowed, the court being given a wide discretion in admitting any fact or circumstance which may throw some light upon or serve as a link in a chain of evidence bearing upon the issues at trial. Circumstantial evidence alone is sufficient to support a verdict of guilty (except for the crime of treason and, in some jurisdictions, perjury) or it may be used in conjunction with direct evidence. It may corroborate other testimony and may be used to prove any element of the crime, such as the *corpus delicti* or the criminal agency of the accused.[3]

The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused. The statements in this paragraph are contained in substance 3 *Wharton's Criminal Evidence* (12th Ed. 1955) § 980, pp. 465-477 and 1 *Underhill's Criminal Evidence* (5th Ed. 1956) §§ 15-19, pp. 16-29.

As to the assaults, the evidence met the test of legal sufficiency (to be applied by the lower court sitting as a jury) as stated in *Vincent v. State, supra,* and restated by this Court in *Coleman v. State,* 4 Md. App. 386 and *Cobb v. State,* 2 Md.

---

type of evidence is, of course, sufficient to support the verdict, although it does not exclude every reasonable hypothesis consistent with innocence," citing *Holland v. United States,* 348 U. S. 121, 139 and *Moore v. United States,* 271 F. 2d 564, 568 (4th Cir., 1959).

And see *Shockley v. State,* 218 Md. 491, and *Tasco v. State,* 223 Md. 503 in which the circumstantial evidence rule was not applied by the majority, although Judge William R. Horney in dissent felt that the evidence was solely circumstantial and should have been considered within the rule.

3. In *Breeding v. State,* 220 Md. 193, 200, it was held that venue may be established by circumstantial evidence. In *Gamble v. State,* 2 Md. App. 271 it was held that the *corpus delicti* may be proved by such evidence.

App. 230. In considering the evidence the lower court was guided by established rules of law. Proof of guilt beyond all doubt has never been required. *Young v. State,* 4 Md. App. 286. To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence be negatived. *Hayette v. State,* 199 Md. 140, 144. The lower court could weigh the evidence and determine the credibility of the witnesses. *Roeder v. State,* 4 Md. App. 705; *Gibson v. State,* 4 Md. App. 222. It was under no obligation to believe the appellant's denials or explanations. *Eley v. State,* 4 Md. App. 230; *Tillery v. State,* 3 Md. App. 142. It could weigh the alibi testimony and was not required to accept its truthfulness. *Logan v. State,* 1 Md. App. 213. And if we assume that the evidence against the appellant was solely circumstantial, such assumption would not change the result. The lower court could have properly found that the circumstances, taken together, were inconsistent with, or such as to exclude every *reasonable* hypothesis or theory of innocence. "[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand * * * It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors. The rule does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt." 3 *Wharton's Criminal Evidence* (12th Ed. 1955) § 980, p. 477. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively. 1 *Underhill's Criminal Evidence* (5th Ed. 1956) § 17, p. 23 and p. 25.

Authority for our review of the case upon the evidence is Md. Rule, 1086 and we are bound by its provisions. It provides:

> "When a case has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given

to the opportunity of the lower court to judge the credibility of the witnesses."

Our function is not to determine whether we would have come to a different conclusion from that of the lower court nor need we be convinced beyond a reasonable doubt of the appellant's guilt; we determine whether the lower court was clearly wrong in reaching a verdict of guilty on the evidence. *Trout v. State,* 3 Md. App. 259; *Bury v. State,* 2 Md. App. 674. We do not think that it was. The lower court found as a fact that about 4:00 A.M. on 30 October 1966 someone fired three bullets from some weapon into Goldstein's home occupied at the time by Mr. and Mrs. Goldstein and their two children; that a phone call to Goldstein preceded the shooting by about an hour; that the caller represented himself to be the appellant; that Goldstein believed that the caller was the appellant and so identified him; that the person who called was the person who fired the shots; and that person was shown by the evidence "beyond a reasonable doubt and to a moral certainty" to be the appellant. As there was substantial evidence and rational inferences therefrom to support these findings, the judgment of the lower court was not clearly erroneous and we may not set it aside. *Sutton v. State,* 2 Md. App. 639.

The appellant urges that the evidence was confused as to the time of the phone call and the shooting due to the change from daylight saving to standard time. Mrs. Goldstein in giving the time of the call as 3:00 A.M. stated they had set the clock ahead an hour before retiring. But the testimony of Officer Mathis clearly established that he received a call to go to the Goldstein residence at 3:15 A.M. standard time at which time Goldstein reported the phone call to him, and that he returned to investigate the shooting at 4:49 A.M. standard time. The question is also raised as to the time the New Eastern Cab Company received a call to go to Denny's, but again it is clear that the time was determined to be 1:46 A.M. standard time—"after the adjustment." The appellant complains that no evidence was produced as to the type of bullet fired into the house and that it was not shown that he owned a rifle. He points out that he did not confess nor make any statement to the police and that he produced testimony showing he was elsewhere, and had not used

his car or his motorcycle that evening. But these matters go to the weight of the evidence and to the credibility of the witnesses and are not considered by us in our determination of the legal sufficiency of the evidence.

## THE CONVICTION OF UNLAWFUL USE OF A TELEPHONE

The appellant was found guilty of the offense charged in the 4th count of indictment No. 32224 purporting to allege the crime proscribed by Md. Code, (1967 Repl. Vol.), Art. 27, § 555A.[4] The section provides, in relevant part:

> "It is unlawful for any person to make use of telephone facilities or equipment (1) for an anonymous call or calls if in a manner reasonably to be expected to annoy, abuse, torment, harass, or embarrass one or more persons; (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons; or (3) for any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy, or indecent."

The evidence did not show a violation of (1) as the call was not anonymous.[5] The caller identified himself as "Vonnie's husband, Robert Nichols," and was so identified by Goldstein. Nor did it show a violation of (2) as there was only one call proved and not repeated calls. The count did not allege a violation of (3) and in any event the evidence was not sufficient to establish that any comment, request, suggestion or proposal was obscene, lewd, lascivious, filthy, or indecent.

We think that the evidence was not legally sufficient to war-

---

4. The appellant did not attack the sufficiency of the count to allege an offense. It alleged that the appellant " * * * unlawfully did make use of the telephone facilities or equipment for an anonymous call or calls, or with intent to annoy, abuse, torment, harass, or embarrass the said Seymour Robert Goldstein * * *." It appears that it does not correctly allege the offenses as proscribed by the statute.

5. Webster's Third New International Dictionary (unabridged) defines anonymous as "having or giving no name: of a name or with the name unknown or unrevealed."

rant the finding of the lower court that the appellant was guilty of this offense beyond a reasonable doubt. Therefore its judgment on the evidence was clearly erroneous and must be set aside.

*Judgments on the second count of each of indictments nos. 32224, 32225, 32226 and 32227 affirmed; Judgment on the fourth count of indictment no. 32224 reversed and case remanded for a new trial thereon; appellant to pay costs.*