PAUL McANDREW GRAHAM *v.* STATE OF
MARYLAND

[No. 32, September Term, 1971.]

*Decided October 19, 1971.*

172

The cause was argued before MORTON, ORTH and POW-ERS, JJ.

*Barry S. Frame* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Howard L. Cardin, State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant, Paul McAndrew Graham, was convicted of murder in the first degree and of robbery with a deadly

weapon by a jury in the Criminal Court of Baltimore. Respective sentences of life imprisonment and 20 years, concurrent, were imposed.

The record indicates that on April 12, 1970, at approximately 11:45 p.m., a Baltimore City police officer was directed to the body of Leon Ford, Jr., lying in an embankment on the Carroll Park Golf Course. The officer testified that the body was covered with debris; blood stained napkins were found in the deceased's pockets; and a blue hospital pad was found on top of the body and another one 50 feet away.

A member of the Chief Medical Examiner's office testified that he performed an autopsy and it revealed that the body contained 10 gunshot wounds, three of which were sufficient to cause death. One of the bullets pierced the deceased's left wrist and, according to the doctor, he was able to match the hole in the band of a wristwatch, owned by the deceased, with the bullet wound in the deceased's wrist. He further testified that death had occurred some three to four days prior to discovery of the body but stated, additionally, "that a body with this much decomposition could have been killed two weeks prior to discovery of the body * * *."

It was stipulated by the defense and the State that bullets recovered at the scene of the crime and from the body were fired from a .38 caliber revolver. The murder weapon was never found.

Over objection, Graham's brother-in-law, a police officer, testified that Graham lived with him from March 1970 until a Thursday early in April 1970 and that a week after Graham left, he discovered that his .38 caliber revolver was missing. He stated that Graham knew he owned the gun and had access to the bedroom where it was kept.

The 11 year old sister of the deceased testified that Graham came to their home in the early evening of April 3, 1970, and asked the deceased to drive him to Belvedere Avenue; that they then left in the deceased's car; and she never again saw her brother alive.

174

A brother of the deceased testified that about 7:00 p.m. or 7:30 p.m. on April 3, 1970, he saw his brother and Graham drive away in the deceased's 1970 blue Mustang. He made an in-court identification of a wristwatch, with what appeared to be a bullet hole in the band, as having been worn by the deceased that evening and identified two rings, one with a U.S.N. insignia and one with a red stone, as having been on a key chain worn by the deceased that evening. This was the last time he saw his brother alive.

Edward Turner testified that about 1:30 a.m. on April 4, 1970, he saw Graham in South Baltimore driving alone in a 1970 blue Mustang. Graham told him he was test driving the car for the purpose of buying it. Graham said he was about to drive to North Carolina to see his wife and asked Turner to accompany him but Turner refused. They then met some girls with whom they stayed until about 2:30 a.m. He last saw Graham driving the blue Mustang in the direction of the Baltimore-Washington Expressway at about 2:45 a.m. He further stated that although Graham did not seem upset that night, he did appear to be in a hurry.

An officer of the Fayetteville, North Carolina, Police Department testified that at a police assembly in the early afternoon of April 13, 1970, he was advised "to be on the lookout for a 1970 blue Mustang with Maryland registration unknown, occupied by Paul Graham and a description followed which was a Negro male, approximately six foot two, 190 pounds"; and that Graham was "wanted for murder." The officer stated that about 4:30 the same afternoon, while driving a marked police car, he observed a 1970 blue Mustang with Maryland plates being operated by a negro male with a white passenger; that he observed the car stop and discharge the passenger and then drive off. The officer radioed for assistance and a short time later he and officers in another police car stopped the Mustang. According to the officer, he stood on the left hand side of the Mustang while a fellow

officer stood on the right. He asked the driver, whom he identified in court as the appellant, Graham, for his operator's license and his vehicle registration. According to the officer, appellant hesitated whereupon the officers "pulled out" their service revolvers and appellant then produced a billfold. As appellant was going through the billfold, the officer standing at the right of the vehicle stated "this is Graham. There's some identification with his name on it." The billfold contained identification cards of the appellant. It also contained a social security card, driver's license and registration card in the name of the deceased, Leon Ford, Jr., and a pawn ticket issued to Graham for a wristwatch owned by the deceased. The officer also testified that they took two rings from Graham which were later identified as those of the deceased.

A Baltimore City police officer testified that he went to Fayetteville, North Carolina, searched the Mustang and observed blood on the floor and arm rest and recovered a blue hospital pad similar to those found at the murder scene.

Graham took the stand and conceded that the deceased drove him to Belvedere Avenue on the evening of April 3, 1970, but stated that they spent the early evening drinking with two girls, whose last names he did not know, during which time the deceased offered to lend him his car to drive to North Carolina to see his wife. At 10:45 p.m. one of the girls and the deceased left to get some marijuana with $10 he had given to the girl. According to Graham, the girl returned in about 45 minutes alone and gave him the keys to the deceased's car.[1] According to Graham, he left in the deceased's car and drove to the Westport area where he met Turner, drank with some girls for several hours and thereafter drove to North Carolina. He visited his wife and mother for several days and, according to him, was planning to return

---

1. A proffer was made on behalf of appellant that the girl told him the deceased was too drunk to drive and that she sent him home in a cab but appellant was not permitted to testify concerning her statement to him.

to Baltimore on April 7 since he had promised the deceased to return the car on the Monday following his Thursday departure from Baltimore. He testified that on April 6 he was arrested at Ft. Bragg, North Carolina, and held overnight for investigation of being AWOL and then released. He intended to return to Baltimore immediately but was then arrested for being drunk and again turned over to the authorities at Ft. Bragg and again subsequently released. He denied ever owning or having in his possession a .38 caliber revolver; said he tried to telephone the deceased to inform him he would be late getting the car back to Baltimore but could not reach him; admitted pawning the deceased's watch but asserted he found it between the seats of the car; and stated that he found the deceased's driver's license and registration card in the glove compartment of the car. He denied having "any argument, fight or anything" with the deceased during the time he was with him on April 3, 1970.

In this appeal, the first contention relates to the testimony of Graham's brother-in-law, a police officer, that his .38 caliber revolver was discovered to be missing a week after Graham left his home and that Graham knew of the gun and had access to it. It is contended that the admission of this testimony was highly prejudicial and that the prejudice far outweighed any probative relevancy it may have possessed. We do not agree.

As was stated in *Nichols v. State*, 5 Md. App. 340, 350:

> "Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. It is admissible whenever relevant to the determination of guilt or innocence and great latitude is allowed, the court being given a wide discretion in admitting any fact or circumstance which may throw some light upon or serve as a link in a chain of evidence bearing upon the issues at trial."

It was stipulated that the victim was killed by bullets fired from a .38 caliber revolver. The testimony of Graham's brother-in-law established that Graham had access to his .38 caliber revolver and that the revolver was missing at the time of the murder. We cannot say that the circumstance of Graham's access to the missing gun was so remote or irrelevant as to compel a finding that the lower court abused its discretion in admitting into evidence the testimony relating thereto.

Appellant next contends that his arrest in North Carolina was unlawful and, thus, the articles seized incident to that arrest were improperly admitted into evidence.

The legality of appellant's arrest must be determined by the law of the jurisdiction in which he was arrested. *Boddie and Brooks v. State,* 6 Md. App. 523, 531. See *Miller v. United States,* 357 U. S. 301, 305. The applicable North Carolina law is found in Section 15-41 (2) of the General Statutes of North Carolina (1965 Repl. Vol.) which provides: [2]

> "A peace officer may without warrant arrest a person: * * * (2) [w]hen the officer has reasonable ground to believe that the person to be arrested has committed a felony and will evade arrest if not immediately taken into custody."

The words "reasonable ground", as used in the statute, are the substantial equivalent of "probable cause" within the meaning of the Fourth Amendment to the United States Constitution. *Draper v. United States,* 358 U. S. 307; *State v. Bell* (N.C. 1967) 153 S.E.2nd 741. And reasonable ground or probable cause exist "where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense

---

2. See Md. Code, Art. 27, § 594B (c) for a comparable provision.

has been or is being committed." *Draper v. United States, supra,* at 313.

The appellant does not contend that the information known to the North Carolina police was insufficient to furnish them with reasonable ground or probable cause to arrest an individual conforming to the description given them earlier at their police assembly. Rather, he argues that because appellant was still sitting in the car at the moment he was arrested, the officer could not determine "the height and weight of the driver of the vehicle, nor was there any other identifying characteristics, other than the fact that the appellant was Negro." Thus, it is contended that the officers lacked probable cause to believe that Graham was the individual referred to in the police "lookout." If we assume, as Graham argues, that his arrest occurred moments prior to the officers observing his identification card in his wallet, which was substantial evidence of his identity, it is still apparent that the North Carolina officers had ample reason and cause to believe that the negro driver of the 1970 blue Mustang with Maryland license plates was the individual wanted for murder by the Baltimore police and described in the police "lookout." "In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U. S. 160, 175. The arrest in North Carolina was, in our opinion, legal and the evidence found during the search incident thereto was properly admissible. See *Mullaney v. State,* 5 Md. App. 248.

Appellant next urges that since the evidence presented by the State was solely circumstantial, guilt can only be established if every other reasonable hypothesis of innocence is excluded. But this argument, which at times has assumed the dimensions of a litany, does not accurately reflect the law. See *Metz v. State,* 9 Md. App. 15. Proof of guilt beyond all doubt has never been required, even

in the most serious criminal cases. *Pettis v. State,* 2 Md. App. 651, 653. As this Court stated in *Streat v. State,* 11 Md. App. 543 at 547:

"In every criminal case the defendant is presumed innocent until proven guilty and the burden is on the State to prove the accused's guilt beyond a reasonable doubt. This Court will not disturb a jury's verdict on the evidence if the evidence adduced at trial either shows directly, or supports a rational inference of the facts to be proved from which the jury could be fairly convinced, beyond a reasonable doubt, of the accused's guilt of the offense charged. *Williams v. State,* 5 Md. App. 450. And in applying this rule, no distinction is made between a case where there is direct evidence of guilt and a case where the evidence is circumstantial. In either case, the trier of fact must be convinced beyond a reasonable doubt. *Metz v. State,* 9 Md. App. 15; *Nichols v. State,* 5 Md. App. 340, 350."

Here, the jury had before it evidence that appellant, when arrested, had exclusive possession of the deceased's car, rings, wristwatch, social security card, driver's license and registration card. The jury was not required to accept the appellant's exculpatory explanation concerning his possession and, in the absence of an acceptable explanation, could factually infer that the items were stolen from the deceased by the appellant at the time of the murder. *Streat v. State, supra* at 548. It is true, as appellant argues, that the evidence indicates that he was in North Carolina from April 5, 1970 to April 13, 1970, a period of some eight days, and that the medical examiner had testified that the deceased had probably been killed some three to four days before his body was discovered on April 12, 1970, which would indicate that at the time of the killing the appellant was in North Carolina and thus could not have committed the murder. This argument, however, overlooks the additional testimony of

the medical examiner that "a body with this much decomposition could have been killed two weeks prior to discovery of the body * * *." This testimony, of course, permitted the jury to make a sound inference that the deceased was killed on the evening of April 3, 1970, which is the evening appellant admits being with the deceased and which is the evening the deceased was last seen alive.

Under the totality of circumstances, we are of the opinion that there was ample evidence from which the jury could find the appellant guilty of murder in the first degree and guilty of armed robbery.

Appellant next contends that he was denied due process by the failure to include in the transcript of the proceedings below, which is the basis for this Court's review, a transcription of the lower court's instructions to the jury, the closing arguments of counsel and the taking of the jury's verdict. It appears that the stenographic notes of these particular proceedings were taken at the time but accidentally destroyed prior to transcription. Appellant concedes that no exceptions were taken to the court's instructions and no objections interposed to the taking of the verdict. It is argued, however, that several objections to the State's Attorney's closing remarks were made by defense counsel, who is also counsel on appeal, although he cannot reconstruct from his trial notes the specific remarks he found objectionable at the time they were made. Aside from the fact that this candid admission would indicate the insignificance of the objections and, thus, demonstrate that there has been no showing of prejudice, the record indicates there was no request that the closing arguments be recorded as provided in Rule 32 of the Supreme Bench of Baltimore City. Accordingly, appellant must be deemed to have waived his right to have the closing arguments of counsel transcribed. *Fletcher and Smith v. State,* 6 Md. App. 219, 223-224.

It is finally contended that the State's Attorney's cross examination of Graham with respect to his prior criminal record was so prejudicial that the lower court committed reversible error in not granting his motion for a

mistrial. It appears that after Graham, in response to the State's Attorney's question, admitted having been previously "convicted of one crime, that was unauthorized use", he was then asked several times by the State's Attorney, over his counsel's objection, if he had not also been convicted of the crime of larceny after trust and each time Graham answered in the negative. The presiding judge finally asked Graham: "How many times have you been convicted of a crime?", and Graham answered: "One." It is now argued that the conduct of the State's Attorney in pressing his questions concerning Graham's conviction of a second crime created an implication that he was falsely denying the commission of a second crime.[3]

In the interest of a fair trial, counsel for the State should not persist in efforts to impeach the credibility of an accused by unduly pressing questions relating to previously committed crimes after receiving a negative answer to his original question. If he has valid evidence of their commission by the accused, he should then offer it in evidence. A State's Attorney's violation of this admonition could serve as a basis for declaring a mistrial. *Cook v. State*, 225 Md. 603; *Woodell v. State*, 2 Md. App. 433, 438. Here, however, the trial judge intervened and by his question cleared the atmosphere so that the uncontradicted evidence before the jury was that Graham had been previously convicted of one, and only one, crime. While the persistence of the State's Attorney in propounding the heretofore outlined flurry of questions was improper, we cannot say that it amounted to misconduct of sufficient dimension to compel us to find that the discretion to grant or deny a mistrial, which rests with the trial judge, was here abused. *Hurley v. State*, 6 Md. App. 348, 355.

*Judgments affirmed.*

---

3. Had the presiding judge been requested to give the jury a clarifying instruction, undoubtedly he would have granted it.