REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2894

September Term, 2015

_____

TERESA ROSS

v.

STATE OF MARYLAND

_____

Meredith,
Nazarian,
Moylan, Charles E., Jr.
       (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  March 3, 2017

A drone may release a bomb and incinerate a building in the outback of Afghanistan while the hand that guides the drone and releases the bomb sits quietly before a control panel in Colorado Springs. If called before a court of inquiry, that hand at the control panel will not enjoy the alibi of having been half a world away nor be able to invoke the disclaimer of never having touched the drone. The phenomenon of aiding and abetting, if not indeed that of first-degree principalship, has undergone a sea change.

## The Present Case

The appellant, Teresa Ross, was convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge James J. Lombardi, of three counts of theft of $100,000 or more in United States currency. On this appeal, she contends

1.   that the evidence was not legally sufficient to prove the mens rea of theft;

2.   that the State's case was based solely on circumstantial evidence and that it failed to rule out every reasonable hypothesis of innocence;

3.   that Judge Lombardi failed to instruct the jury about the burden on the State to disprove the Good Faith defense and the Claim of Right defense to theft; and

4.   that Judge Lombardi erroneously failed to grant the appellant's Motion for New Trial based on newly discovered evidence.

## The Facts In This Case

Between July 31, 2014 and October 13, 2014, over forty high-end Samsung televisions were stolen from the Sears Department Store in Annapolis with a total value in excess of $200,000. The mode of theft can generally be described as credit card fraud, perpetrated through the coordinated efforts of numerous parties, known and unknown. The

1

appellant was convicted of knowingly facilitating the fraudulent use of credit card information, in her capacity as a sales associate, thereby perpetuating and accelerating the flow of the televisions out the store and into the hands of the thieves, all the while earning an impressive commission. The following represents a brief summary of that version of the evidence most favorable to the State.

On July 31, 2014, a young man entered the Sears store in Annapolis, and approached James Miller – the lead supervisor of the electronics department. He identified himself as "Geoffrey Atkins, Jr." and informed Miller that he wanted to purchase a 75-inch Samsung television to give to his mother for her birthday. When it came time to pay, however, his debit card was declined for insufficient funds. He promptly took out a cellphone and made a five-minute phone call. At the conclusion of the call, he offered Miller an eminently pragmatic solution: his father, Geoffrey Atkins, Sr., would call in later to pay for the television, and he would simply pay his father back over time.

As promised, a Geoffrey Atkins, Sr. ("Mr. Atkins") did call the electronics department that evening to pay for the television. To that end, he provided Miller with the number for an American Express credit card. Bryan Jansen, the store manager, testified that although it was generally Sears policy not to conduct over-the-phone transactions using third-party credit cards (i.e., any non-Sears credit card) he gave Miller permission to go forward in that instance based on his understanding that the sale began as an in-person transaction. Miller entered the credit card information into the register, and the transaction was "immediately approved" without incident.

In the weeks that followed, "Mr. Atkins" or his wife, "Mrs. Atkins," would regularly call the Sears electronics department to purchase additional televisions, which they at one point indicated were being used to "upgrade" the family's chain of barbershops so as to "keep up with the times." Jansen testified that it is not uncommon for individuals to purchase large quantities of televisions from Sears for the purpose of outfitting a business location.

Not all of the transactions, however, proceeded "without incident." On some occasions, the cash register would generate what was referred to at trial as a "register prompt." Jansen explained that register prompts are "generally fraud-detecting questions," or instructions for the sales associate conducting the transaction to take additional steps in order to verify the identity of cardholder. A common instruction was for the sales associate to contact the credit card company to obtain an "authorization code."

> "[MR. JANSEN]: <u>There are occasions in which the register is going to ask for more information</u>. And the[s]e are generally fraud-detecting questions. <u>One of the most common questions is for you to call the credit agency involved</u>.
>
> "<u>So if it is a Discover Card</u>, <u>there's a specific Discover number that you're to contact to get approval for that charge</u>.
>
> "[PROSECUTOR]: And there's a specific authorization given after that?
>
> "[MR. JANSEN]: Yes. So <u>at that time, the register will not proceed unless you enter an authorization code</u>. <u>That authorization code is provided by the person on the phone that you contact</u>."

(Emphasis supplied).

On August 7, 2014, Miller was handling an over-the-phone purchase by Mrs. Atkins when a register prompt was generated that requested an authorization code from American Express. When Miller informed Mrs. Atkins that he needed to provide American Express with additional information, she suggested that she could just call the company directly from her house phone and then relay the authorization code to Miller.

> "[MR. MILLER]: And she said she was going to call from her house phone. I read her off the phone number. She had a conversation with someone on the other line that sounded exactly like the conversation I would have had if I called.
>
> "And she like, right on cue, asked me for certain information to give it to them. So everything sounded like it was legit."

(Emphasis supplied).

Over the course of the next several weeks, whenever an authorization code was required during an Atkins purchase, a member of the Atkins family would provide it.[1] Between July 31, 2014, and August 25, 2014, the Atkins family purchased a total of fourteen (14) high-end televisions, and charged a total of $55,524.42 to various American Express and Discover credit cards.

Bryan Jansen testified that there came a point when, in the course of reviewing a monthly "Profit and Loss Statement," he noticed an unusually large amount of "charge-

---

[1] Unbeknownst to either Bryan Jansen or James Miller during the period covered by these events, there was a "flaw" in the verification process with respect to the authorization codes. It might more accurately be described as an Achilles heel. Evidently, while an American Express authorization code must always consist of six numeric digits, *any* six digits will suffice. So too with any five digits and a letter in the case of a Discover Card. To reiterate, this loophole was not common knowledge.

backs," which were defined as "a debit issued by a credit card company to a merchant based on noncompliance with the merchant agreement policy." In other words, Sears was being left on the hook for numerous credit card transactions which had not been properly verified with the credit card company. Concerned that the unusually large amount of charge-backs might be related to the recent boost in televisions sales, Jansen asked Miller into his office, and the two shared an epiphany:

> "[MR. MILLER]: And he just wanted to sit me down and talk to me about the process I was taking in serving this member [i.e., Mr. and Mrs. Atkins]. And I basically ran through the whole thing with him in detail, step by step, how a transaction would go.

> "And <u>when I got to the point of, you know, the system prompted for an authorization code, that's when he stopped me. He was like, well, you didn't call? And that was when I had that ah-ha moment</u>, like I should have been doing this the whole time."

(Emphasis supplied).

As a result of that conversation, Jansen emphasized to Miller that for all future Atkins purchases it was critical that all register prompts be precisely followed, and specifically, where an authorization code was requested that it must be obtained by calling the credit card company directly and was never to be provided by the customer. Miller, in turn, stressed the importance of these protocols during individual conversations with each of the three of the sales associates then under his supervision: Sherry Harley, Bernardette Carter, and the appellant – Teresa Ross.

Between September 10 and October 13, 2014, not only did the Atkins television purchases continue unabated, but the frequency and size of the transactions actually increased. Notably, with the exception of two transactions on October 9 which were

5

handled by Bernardette Carter, the appellant was the exclusive conduit through which all Atkins purchases were made. In less than five weeks, the appellant sold the Atkins family twenty-nine (29) high-end Samsung televisions, with a total value of $125,684.41. The appellant's approximate commission on those sales would have been between $2,500 and $3,770.

Miller testified that whenever he learned of an Atkins purchase – typically in the course of the store's daily morning meeting – he would make a point of speaking to the appellant and confirming that all register prompts had been followed and that, if necessary, the credit card company had been contacted directly to obtain an authorization code. The appellant repeatedly assured Miller that she was following protocol. That, it would later turn out, was not true.

At some point, the dubious circumstances surrounding the Atkins purchases was brought to the attention of the Sears Asset Protection division and eventually became the focus of a multi-agency investigation involving representatives from Sears, Discover Card, and the Prince George's County Police Department. Members of the investigation team observed live store-surveillance footage of the appellant completing transactions which were later determined to have been fraudulent.

On October 13, 2014, the date of the appellant's last sale, she completed four separate Atkins transactions in a span of less than two hours, involving eight televisions, and charging a total of $33,007.84 to both American Express and Discover cards. Those televisions were made the subject of at least two controlled deliveries, under the supervision of Prince George's County police, to 410 Warfield Drive, one of three

addresses provided by the Atkins family. On October 17, 2014, the date of the second controlled delivery, police executed a search warrant on the home and recovered a number of the stolen televisions. Phillip Anderson, along with Lynwood Belcher – the appellant's eventual co-defendant – were in the home and were arrested at that time.

The next day, on October 18, 2014, William Samuels, the asset protection manager at the Annapolis Sears, brought the appellant into his office. He described her demeanor as "extremely upset and nervous," before he had even explained to her why she was there and that fifteen minutes passed before she was calm enough to talk. Samuels asked the appellant where she had gotten the authorization codes for the transactions. She responded, in direct contrast to her repeated assurances to Miller, that she obtained the authorization codes from the customer. Samuels asked the appellant why she had not followed proper procedure for obtaining the authorization codes. She replied, simply, that she "was too busy."

On September 22, 2015, the jury convicted the appellant of three counts of theft scheme over $100,000. On January 15, 2016, the appellant received a suspended two-year sentence for each count, was placed on two years' probation, and ordered to pay $3,000 of restitution.

## Legal Sufficiency of the Evidence

The appellant's primary contention is that the evidence was not legally sufficient to permit Judge Lombardi to submit the case against her to the jury. Such a contention, of course, focuses exclusively on the burden of production. The appellant's gratuitous jury argument to us, therefore, needs no response. On the burden of production, we can narrow the focus even more tightly. The challenge is not to proof of the actus reus of theft,

7

although, to be sure, it was a highly unusual <u>actus</u> <u>reus</u>. The sole challenge is to the proof of the appellant's <u>mens</u> <u>rea</u>.

Although the application of the standard of review to the unusual facts of this case may stray far from the well-trodden factual path, the standard itself is clear. <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct 2781, 61 L.Ed.2d 560 (1979), is the universally followed pole star, as it tells us, 443 U.S. at 319, that the standard for review of the sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Bible v. State</u>, 411 Md. 138, 156, 982 A.2d 348 (2009); <u>State v. Smith</u>, 374 Md. 527, 533, 823 A.2d 664 (2003); <u>White v. State</u>, 363 Md. 150, 162, 767 A.2d 855 (2001).

When the appellant, and her co-defendant Lynwood Belcher, each moved for a judgment of acquittal at the end of the entire case, the discussion was singularly unilluminating. Much of it concerned the co-defendant, against whom the State's case was totally different. Another large part of it concerned the conspiracy count, of which the jury acquitted the appellant. The heart of the appellant's very brief argument was that if she were guilty, then so was her supervisor, James Miller. That however is hardly proof of innocence. As to the appellant, the Judge denied the Motion for Acquittal.

> "THE COURT: <u>The jury is going to listen to your arguments, and you may be able to persuade them</u> because you have a different standard that you're meeting with the jury than you're meeting with me.
>
> "All the State has to do is provide legally sufficient evidence to get to the jury. Once they get to the jury, it's up to you to make your pitch that

you're making to me. <u>That's a pitch that you should make to the jury and not to me</u>."

(Emphasis supplied). That does not help us much.

The <u>actus</u> <u>reus</u> of this particular theft, as we have said, was highly unusual. Between July 2014, and October 2014, a group of thieves of unknown number devised a sophisticated scheme whereby they were able to steal approximately forty-eight (48) highly priced flat-screen/curve-screen television sets from the theft victim, the Sears Holding Corporation ("Sears"), amounting to a potential loss to Sears of $204,000. Throughout the entire course of this operation, however, no culprit was ever required to lay a heavy hand on a single item of stolen property. Except in a constructive sense, there was neither a common law asportation nor a common law caption. It would have bewildered Blackstone. It was all done by telephone.

The telephone was the critical gateway and the appellant was one of the few persons who served as a gatekeeper. The most routine of credit card transactions are face-to-face between the vendor and the vendee. The credit card is "swiped" through a register. Unless a special "alert" is triggered, the verification of the card is virtually immediate and the sale is consummated. The sale gets more complicated, however, when the order comes in by telephone. The vendee orders a product and proffers payment by credit card, furnishing the credit card number and possibly other verifying data. Ordinarily, even the telephone purchase is routine. There are, however, circumstances that sometimes take the use of the credit card out of the routine and call for enhanced scrutiny. Even at the initial "swiping" of the card but more frequently with respect to a telephone purchase, there may pop up

9

what the trade refers to as a "register prompt." That is something that at least raises the eyebrow of suspicion. The card may have expired or be otherwise invalid. The card may have been stolen. The card owner may be dead. The owner may live in Nome, Alaska, and the card itself has never been used in "the lower 48." The purchase may involve a large sum of money on a card that seldom, if ever, reaches such heights. There may be an unusually large number of purchases for similar items under circumstances that are, at the very least, out of the ordinary. The "prompts" simply alert the thus prompted gatekeeper that something may be "fishy," and that heightened scrutiny is the order of the day.

The "prompts" are designed to trigger precautionary procedures. A gatekeeper such as the appellant is, upon receiving a prompt, supposed to notify the credit card company so that it, in turn, may undertake some further examination. Only when the credit card company has checked out the situation and issued an "authorization code" to the vendor may the credit card sale then properly proceed. The flaw in the system is that, using American Express as an example, any six digit number will appear to be a valid authorization code even though it is not. If a salesperson such as the appellant logs in any six digit number as an ostensible authorization code, the sale will go forward even if it was not properly authorized. If the sale appears to have been authorized, the gate will open.

During many of the ill-fated transfers in this case, particularly those between September 10, 2014 and October 13, 2014, it was the appellant who controlled the movement of the ultimately stolen property. While, on the motion for acquittal, the appellant meekly protested her lack of physical control over the property, the reality was quite otherwise. If a salesperson such as the appellant, who receives a telephoned credit

10

card order, authorizes that order to go forward, Sears employees at a warehouse in Columbia, Maryland forthwith remove a television set from a shelf and place it on a truck. Other Sears employees then drive the truck to the destination given by the buyer. If, on the other hand, the telephone operator puts the sale on hold and remands the order to the credit card company for a further protective inquiry, the television set will not leave its shelf and the truck will not leave the warehouse.

Although this may not have been a style of hands-on entrepreneurial activity familiar to Currier and Ives or even to Norman Rockwell, it is today indisputably a paradigm of latter-day control. As thousands of dollars pass back and forth over telephone lines, an operator such as the appellant exerts control over that passage of funds as surely as the driver of a Brinks truck controls the passage of cash from place to place. As Sears authorized the appellant to obtain and exert control over the movement of its high-priced television sets, it looked to her vigilance not to release them to a credit card thief, even as it would look to the vigilance of its night watchman not to hand over its inventory to a midnight burglar. The technology of theft has irrevocably changed, as the number of a stolen credit card has taken the place of a jimmy at the window.

As we assess the legal sufficiency of the evidence, our focus, of course, is not on what the jury **should** have believed. It is on what the jury **could** have believed.

## A. There Was Something "Fishy" About the TV Orders

It could have believed that the appellant had good reason to suspect that there was something "fishy" about the TV purchases. The appellant was no mere telephone receptionist, handling calls in an essentially automatic or robotic fashion. She was

11

authorized to make at least medium-level executive decisions involving significant sums of money. Based on information given to her on the phone, she could allow sales charged to credit cards to go forward immediately or she could put those sales on what could turn out to be temporary or even permanent hold. It was most definitely her call to make. In this case, the circumstances surrounding the sales of numerous highly priced sets to the family of Mr. and Mrs. Geoffrey Atkins was such that the appellant could be found to have had reason to suspect that something "fishy" might be afoot. Not necessarily criminal, simply "fishy." Unusual, strange, out of the ordinary.

With the small staff of the electronics department holding essentially daily morning meetings at which was discussed the significant sales of the day before, it was common knowledge that the Atkins family was buying numerous high priced televisions units that cost approximately $3,000 to $6,000 each. As the weeks rolled by, the number of those sales were mounting until they ultimately totaled 46 such sales. The proffered explanation that the Atkinses were opening and furnishing a chain of barbershops with entertaining amenities could, of course, been completely accepted at face value. As a jury ponders possibilities, on the other hand, the barbershop explanation might have been taken with a grain of Attic salt. From the surrounding circumstances alone, the jury might have concluded that the appellant had reason to suspect that something strange was going on. When the appellant, therefore, was called upon to perform her gatekeeping responsibilities, there was good reason for her to approach those responsibilities with a sense of heightened scrutiny.

The obligation on the appellant to exercise heightened scrutiny became even more direct and explicit, moreover, when first her immediate supervisor, James Miller, and then the officer manager, Bryan Jansen, gave her express orders to follow all of the precautionary protocols when dealing with telephoned orders for the high priced television units from Geoffrey Atkins or his wife. The testimony of Bryan Jansen, the store manager, was very specific about his conversations with the appellant about obtaining the proper authorization from the credit card company.

> "[MR. JANSEN]: James [Miller] would instruct me why we had a big day the day before. If it was a situation where I was told that Mr. Atkins purchased more TVs, the next time that I would see [the appellant], I would follow up with [her] and confirm the process in which, if they are prompts that come up in the register, the prompts must be followed. The credit card company must be contacted. And we must personally obtain the authorization number from the credit card company.

> "[PROSECUTOR]: Did you say that to her?

> "[MR. JANSEN]: Yes.

> "[PROSECUTOR]: Teresa Ross? Did you say obtain that authorization?

> "[MR. JANSEN]: Specifically, obtain that authorization from the phone number provided. There was a question, who was able to provide the authorization codes.

> "I specifically discussed, the customer is never allowed to provide authorization codes. They must be obtained by calling the number that comes up on the prompts, and that is the authorization number that must be entered.

> "[PROSECUTOR]: And did Ms. Ross indicate that she understood that was the process?

> "[MR. JANSEN]: Yes."

(Emphasis supplied).

13

James Miller, the appellant's immediate supervisor, independently confirmed that, between September 10, 2015 and October 15, 2015, he questioned the appellant on a number of occasions about her following of the precautionary protocols and was regularly assured by her that she had, indeed, been following them.

> "[PROSECUTOR]: Okay. So in those, between the 10th of September and the 13th of October, were you having – I think you said – various conversations with Teresa to make sure she was following the process?
>
> "[MR. MILLER]: Yes, I was.
>
> "[PROSECUTOR]: How did you know the transactions were coming through and when did you know to talk to her?
>
> "[MR. MILLER]: Usually, we would have a store meeting every morning to talk about the results of the day before. And I would usually find out about it in that morning meeting. And then from there, the next time I saw Teresa, I would make sure and say, hey, I saw that we had an Atkins transaction yesterday or the day before yesterday, did you – you know, did you verify? Did you call yourself to verify the authorization code with the insurance card, or credit card … and she told me that she did."

(Emphasis supplied).

The importance of the precautionary protocols was thereby emphasized by the repeated concern of both the store manager and her supervisor on days following an Atkins' purchase, as to whether she had, indeed, observed those precautionary protocols. The jury could readily have concluded that the appellant had good reason to be on high alert.

## B. A Duty To Protect Sears From Telephone Theft

The evidence was also sufficient to have permitted the jury to make another significant finding. That finding could have been that the appellant was no mere third party observer who, even if suspecting that Sears was being victimized by credit card theft, was

under no obligation to step forward and to try to prevent it. As an employee of Sears authorized to make decisions with significant financial consequences, the appellant had an affirmative duty to Sears, if she suspected that Sears might be being victimized by credit card theft on telephoned orders, to wit, to take those steps within her power and within her area of responsibility to prevent such theft. The precautionary protocols that she was instructed to take when processing an order were part of a contractual duty owed by her to Sears. She did not enjoy the option of being blasély indifferent to the victimization of her employer. The intentional breach of a duty that directly facilitates a crime, therefore, could by a jury be deemed far more than a mere instance of negligence or of laziness or of forgetfulness. The precautionary protocols in issue were designed specifically to prevent the type of credit card theft that occurred in this case.

The appellant's arguments about her possible criminality, we note, are unduly constricted within the context of crimes of commission. She neglects the possibility that hers might have been found by the jury to have been a crime of omission, the failure to act by one with a duty to act. In the alternative universe of omission, one's failure to prevent a crime may be as significant as one's affirmative acts of commission.

## C. An Intentional Failure To Perform A Duty

Over the course of this continuing theft by the use of stolen credit card numbers, it was the appellant who authorized the sale with respect to at least 29 televisions, between September 10, 2014 and October 13, 2014. There is no indication that the appellant ever, on a single occasion, called a credit card company to get a proper authorization code. She either blandly accepted a code number offered by the vendee or she made one up. When

questioned about her behavior by William Samuels, the asset protection manager for the Sears, on October 18, 2014, the appellant never denied that she had consistently failed to get proper authorization. Her only excuse for her repeated failure was that she was too busy. Her acts of omission were indisputably intentional.

> "[PROSECUTOR]: And what did you say to her and what did she say to you?
>
> "[MR. SAMUELS]: When I asked her about the authorizations, she – she told me about them…. I asked her. I was like, well, why didn't you call a manager to get an authorization for the codes. Where did you get the codes from?
>
> "She said the customer gave it to her. So I was like, well, why didn't you contact a manager because that's the policy to approve the authorizations. And she said she was too busy to do it. So – which, again, I didn't really understand that, but you know, that's what she told me."

(Emphasis supplied).

The appellant thereby acknowledged that her failure to get proper authorization was intentional. Her only excuse was that she was "too busy to do it." The appellant herself, of course, never told the jury what she did or why she did it. Nor did she tell the jury what she did not do or why she did not do it. She chose not to take the stand in her own defense.

The appellant's repeated disinclination to observe any of the prescribed precautionary measures simply because "she was too busy" contrasted sharply with the behavior of her co-worker Bernadette Carter whose responsibilities paralleled those of the appellant. Ms. Carter testified as to her complete and immediate compliance with the precautionary measures.

16

"[PROSECUTOR]: Okay. Would she [i.e., Ms. Atkins] do this even after you had the conversation with Mr. Miller that said don't do that anymore?

"[MS. CARTER]: <u>I didn't do it after he told me not to</u>.

"[PROSECUTOR]: <u>Oh, you stopped</u>?

"[MS. CARTER]: <u>Yes</u>."

(Emphasis supplied).

## D. Affirmative Misrepresentation

The failure of the appellant to perform her prescribed duties to protect Sears from possible theft was doubly aggravated. She not only intentionally failed to follow the precautionary protocols but she then affirmatively lied about it. She regularly assured both the store manager and her supervisor that she had taken the precautionary steps when they regularly asked her about the matter following each big sale. That cloud of deliberate misinformation, moreover, enhanced the likelihood that the theft would succeed, because if the appellant had honestly acknowledged that she had not taken precautionary measures, there was a good chance that the store manager or the supervisor would then have done so, possibly forestalling thereby at least some of the thefts. The deliberate lying about what she had done or had failed to do was most definitely relevant evidence bearing on the appellant's <u>mens</u> <u>rea</u>. The appellant, of course, offered no explanation for her deliberate deception in this regard.

## E. A Possible Motive Simply of Opportunistic Greed

A motive to commit a crime is not an actual element of the crime and does not figure in the burden of production. It is most assuredly a factor in the burden of persuasion, nonetheless, and may influence a jury in deciding which inferences to draw.

In this case, the appellant might well have been motivated to ignore the precautionary protocols and to authorize the sales to go through by the lure of the commissions she would thereby accrue. The evidence showed that the appellant, as a saleswoman, would earn, for high-end items, a commission of between 2% and 3% of the value of the sale. Simply as an example of what the appellant was earning in commissions, James Miller, her supervisor, testified that during one two-week period, her commission had been $2,500.

> "[PROSECUTOR]: Okay. And when you saw the commissions for Ms. Ross, looking at those documents/your recollection, what was she getting compensated as far as commission while you were getting $1,800?
>
> "[MR. MILLER]: My bonus was on a monthly format. Her commission was on a two-week structure.
>
> "[PROSECUTOR]: Mm-hmm.
>
> "[MR. MILLER]: So my $1,800 bonus was for an entire month. And around that same exact time, her two-week pay period would have been at $2,500 in commissions."

(Emphasis supplied).

The appellant's obvious concern for her commissions was testified to by Anna Astarb, the manager of the Sears warehouse from which the television sets were shipped to the buyers. Referring to the period of October 15 – October 17, 2014, Ms. Astarb referred

18

to a call to the warehouse from a female associate in the Sears store in Annapolis named Teresa.

> "[PROSECUTOR]: Okay. And what, if anything, did that female from Annapolis tell you?
>
> "[MS. ASTARB]: She asked – <u>she inquired as to why the TVs were not being delivered</u>. I told her we did not have them. <u>She, in turn, made a phone call to the distribution center in Columbus, Ohio and asked them if they had sent the TVs to us in Columbia, Maryland, and they said, yes, they had</u>.
>
> And then <u>she again asked me why we didn't have them</u>. And I told her, we were investigating why they didn't come in on the truck shipment. We get truck shipments every night.
>
> "<u>And she made reference that she wasn't going to be able to get her commission if we didn't make that delivery</u>, the customer was going to be very upset that she couldn't make that delivery.
>
> "[PROSECUTOR]: <u>Did she identify herself</u>?
>
> "[MS. ASTARB]: <u>I believe she said her name was Teresa</u>."

(Emphasis supplied).

The appellant was obviously not "too busy" to call the warehouse in Columbia, Maryland and then to call the distribution center in Columbus, Ohio. The appellant may have been "too busy" to inhibit the sales from going through but she was not "too busy" to monitor and facilitate the sales in going through. The evidence permitted a possible jury conclusion that the acquisition of her commissions may have been a motive for facilitating the theft.

19

## F. A Possibly More Sinister Motive

In addition to money from commissions, there was a further possible motivation that the jury would have been permitted (not required but permitted) to infer from the evidence. The appellant may have been more directly involved.

Philip Anderson was originally a co-defendant who entered a guilty plea and was a witness for the State. In his testimony, he was asked to identify and to explain a text message that the police had obtained from his cellphone and that had been sent to Anderson during the life of the conspiracy, to wit, on September 24, 2014. The message was sent to Anderson by "Crazy Lady," identified by Anderson as "Marley." Marley, Anderson explained, was one of the conspirators whose special job it was to "move" the stolen TV units, to wit, to fence them. The intercepted message was:

> "I should beat her ass.
> Teresa ass is moving too fuckin fast."

What could that mean? It clearly meant something. By way of corroborating that otherwise cryptic message, the appellant, had indeed been moving fast. In the 6-week period between July 31, 2014 and September 10, 2014, Sears had sold only 14 of the large television sets. The appellant took over as the primary salesperson on September 10. In the 5-week period following September 10, the sales more than doubled to 29 television sets, worth $125,684. On the evening of September 22, 2014, in one 6-minute period, the appellant sold four television sets with a total value of $19,269. It was that surge presumably that triggered the message to Anderson from Marley about Teresa's moving too fast. After that the speed of the sales actually accelerated. On the evening of September

20

30, 2014, in one 28-minute period, the appellant sold six television sets with a total value of $21,999. Finally, on the evening of October 13, 2014, in one period of one hour and 53 minutes, the appellant sold eight of the television sets with a value of $33,007. Four days later, on October 17, 2014, the market crashed and the police moved in.

At the trial of this case, this small snippet of evidence out of far left field remarkably received no attention. It did not provoke a syllable, yea or nay, from either side of the trial table. It may have been absolutely pivotal, but no one picked up on it. An out-of-court statement by a conspirator during the life of the conspiracy and in furtherance of the conspiracy, however, has traditionally been recognized as being sufficiently reliable to qualify as an exception to the Rule Against Hearsay, when offered against another conspirator. Although no one else may have noticed the significance of the assertion, the jurors were not required to close their ears. Nor are we enjoined to ignore it, as we assess the legal sufficiency of the evidence. The text message was, without objection, in evidence.

Marley, as the fence for the stolen goods or as the conduit to the fence, was a conspirator. The intercepted text message certainly permitted the inference that both Marley and Philip Anderson knew who Teresa was. It permitted the inference, moreover, that Marley was familiar with (and disapproved of) the enhanced speed with which the appellant was expediting the television sales. Marley's threat to "beat her ass" to slow her down permitted the further inference that Marley was in a position to intervene with the appellant about the speed with which she was moving. It is an action that a conspirator would not dare take with an innocent outsider, for that would be a disclosure that could

compromise the entire operation. Marley put the appellant in the conspiracy[2], and that, <u>ipso facto</u>, could have satisfied the <u>mens</u> <u>rea</u> requirement for theft.

## G. The Totality

From all of the above, we have no difficulty in holding that the evidence was legally sufficient to have permitted Judge Lombardi to let the case against the appellant go to the jury. The extent to which the jurors then gave weight to the evidence or assessed witness credibility was in their exclusive province as factfinders. That, of course, is something beyond our ken.

### Circumstantial Evidence Is No Longer Disfavored

In her second contention, the appellant disinters a vestigial relic from the common law that is, at best, moribund. In a few jurisdictions, however, it is not quite dead. (Or, at least, it has not been dead for long). The contention hangs desperately on the statement from <u>West v. State</u>, 312 Md. 197, 211-12, 539 A.2d 231 (1988) that "a conviction upon circumstantial evidence <u>alone</u> is not to be sustained unless the circumstances are inconsistent with any reasonable hypothesis of innocence." (Emphasis in original). <u>And see</u>, <u>Wilson v. State</u>, 319 Md. 530, 537, 573 A.2d 831 (1990). The appellant argues that in

---

[2]    The appellant, to be sure, was acquitted of conspiracy. All that that means is that the State did not carry its ultimate burden of persuasion. It does not mean that it did not carry its earlier and quite distinct burden of production. Many criminal charges routinely fail to satisfy the burden of persuasion, as a matter of fact, even though they have fully satisfied the burden of production, as a matter of law. If this were not so, there would be no need for juries in criminal cases. Appellate review of the legal sufficiency of the evidence, moreover, is concerned only with the burden of production.

the present case "the circumstantial evidence at trial … never ruled out all reasonable hypotheses of [the appellant's] innocence."

West's language was based on a once prevalent attitude toward circumstantial evidence that has long since been almost universally repudiated. In a thorough-going historical analysis of this now anachronistic attitude and its massive repudiation, Chief Judge Wilner pointed out for this Court in Hebron v. State, 92 Md. App. 508, 513, 608 A.2d 1291, (1992), aff'd, 331 Md. 219 (1993):

> "The instruction was based on the notion that circumstantial evidence was of a lesser quality than direct evidence-that it was inherently less persuasive and that the jury should be so informed. Wigmore contested that view as did the great Judge Learned Hand. See United States v. Becker, 62 F.2d 1007, 1010 (2d Cir.1933). It was not until 1954, however, that the underpinning of the instruction was authoritatively debunked and the practice of giving it sharply curtailed."

(Emphasis supplied).

The tide, indeed, turned against this now anachronistic attitude in 1954 with the Supreme Court's pivotal decision in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. The Supreme Court flatly rejected the idea that a case based on circumstantial evidence is to be assessed any differently than a case based on direct evidence.

> "There is some support for this type of instruction in the lower court decisions, … but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect[.]"

348 U.S. at 139-40. (Emphasis supplied). Holland v. United States eliminated the use of such a test in Federal cases and "it caused many … of the States to reexamine the instruction and to eliminate or sharply curtail its use." Hebron v. State, 92 Md. App. at 514.

From its inception, this Court has campaigned vigorously against the now anachronistic view of circumstantial evidence as somehow disfavored. As early as Nichols v. State, 5 Md. App. 340, 350, 247 A.2d 722 (1968), Judge Orth wrote for this Court:

> "The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused.
>
> …
>
> "To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence be negatived."

(Emphasis supplied).

That language was, in turn, quoted with complete approval by the Court of Appeals in Gilmore v. State, 263 Md. 268, 292-93, 283 A.2d 371 (1971). See also, Metz v. State, 9 Md. App. 15, 22-23, 262 A.2d 331 (1970); Dorsey v. State, 9 Md. App. 80, 89, 262 A.2d 591 (1970); Graham v. State, 13 Md. App. 171, 178, 282 A.2d 162 (1971) ("This argument, which at times has assumed the dimensions of a litany, does not accurately reflect the law."); Young v. State, 14 Md. App. 538, 558, 288 A.2d 198 (1972); Finke v. State, 56 Md. App. 450, 472-78, 468 A.2d 353 (1983); Presley v. State, 295 Md. 143, 150, 454 A.2d 347 (1983).

Inexplicably, the opinion of the Court in West v. State, made no mention of the Supreme Court's opinion in Holland v. United States. Nor did it so much as mention Nichols v. State, or its own precedent in Gilmore v. State, or any of the numerous progeny of Nichols and Gilmore. When Wilson v. State, 319 Md. 530, 573 A.2d 831 (1990), was

24

called upon to revisit West v. State, the opinion largely was in accord with the more modern approach. It acknowledged that the accepted test of legal sufficiency is that set forth by the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to wit,

> "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Both Nichols and Gilmore and many of their progeny, moreover, were cited with approval. One small kernel of vitality in West v. State, however, was kept on life support, to wit, a case based on a single strand of circumstantial evidence.

> "To ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, we have long held that a conviction upon circumstantial evidence alone is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence."

318 Md. at 536-37 (emphasis in original). The word "alone" was prominently italicized.

The critics, however, were not entirely mollified even by the significant downsizing of West. As this Court noted in Eiland v. State, 92 Md. App. 56, 68, 607 A.2d 42 (1992), rev'd on other grounds, 330 Md. 261, 623 A.2d 648 (1993).

> "Although it might have been more efficacious if Chief Judge Murphy in Wilson v. State, had simply stomped on this mischievous language once and for all, he nonetheless effectively cabined it to the rare and unusual situations where it still possesses some residual vitality."

(Emphasis supplied). The problem was that although the actual applicability of the now cabined test had been austerely limited, the number of occasions on which it would opportunistically be invoked has not been so limited.

25

"That unfortunate language, which has a vestigial vitality in perhaps one percent of the cases in which it is invoked, is profligately bandied about on numberless occasions when it is not remotely apposite."

92 Md. App. at 62.

Notwithstanding Wilson's effort to keep the language of West tightly tethered, the defense invocation of West has nonetheless been profligate whenever circumstantial evidence is remotely involved. The appellate reception of this profligacy, on the other hand, has been consistently cool. In Hagez v. State, 110 Md. App. 194, 203-04, 676 A.2d 992 (1996), this Court was skeptical about many of the claims.

> "It has been observed that, a "conviction upon circumstantial evidence alone will not be sustained unless the circumstances, taken together, are inconcistent with any reasonable hypothesis of innocence.… The cases that have repeated that litany have been understandably vague about what would constitute a case based solely on circumstantial evidence and what would amount to inconsistency with any reasonable hypothesis of innocence."

(Emphasis supplied).

Clark v. State, 188 Md. App. 110, 116, 981 A.2d 666 (2009), was equally cool to the claim.

> "Several cases have recited the litany that a conviction upon circumstantial evidence alone will not 'be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence.' We have stated that these cases 'have been understandably vague about what would constitute a case based solely on circumstantial evidence and what would amount to inconsistency with any reasonable hypothesis of innocence.' We stated that the better test is 'whether the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact beyond a reasonable doubt, of the guilt of the accused.'"

(Emphasis supplied; citations omitted).

In <u>Smith v. State</u>, 415 Md. 174, 999 A.2d 986 (2010), the Court of Appeals, speaking through Judge Harrell, effectively laid to rest the ghost of <u>West v. State</u> and its outmoded view of the inferior status of circumstantial evidence. It even laid to rest that small kernel of vitality that <u>Wilson</u> had sought to preserve in <u>West</u>.

The message of <u>Smith</u> is clear. Even in a case resting solely on circumstantial evidence, and resting moreover on a single strand of circumstantial evidence, if two inferences reasonably could be drawn, one consistent with guilt and the other consistent with innocence, the choice of which of these inferences to draw is exclusively that of the fact-finding jury and not that of a court assessing the legal sufficiency of the evidence. The State is **NOT** required to negate the inference of innocence. It is enough that the jury must be persuaded to draw the inference of guilt. As the Court of Appeals stated, 415 Md. at 183, "the finder of fact has the 'ability' to choose among differing inferences that might possibly be made from a factual situation.' That is fundamentally the fact-finder's role, not that of an appellate court." Judge Harrell's opinion went on, 415 Md. at 183-84:

> "<u>We do not second-guess the jury's determination where there are competing rational inferences available</u>. We give deference 'in that regard to the inferences that a fact-finder may draw.' … <u>We need not decide whether the jury could have drawn other inferences</u> from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence."

(Citations omitted).

In assessing the legal sufficiency of the evidence in a criminal case, the standard of review is simply the test of <u>Jackson v. Virginia</u>, unburdened by any vestigial barnacles

from a bygone age. The test, the single test, is clear, quoting from <u>Jackson v. Virginia</u>, 443

U.S. at 318-19:

> "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction … is <u>whether</u>, after viewing the evidence in the light most favorable to the prosecution, *any* <u>rational trier of fact could have found the essential elements of the crime</u> beyond a reasonable doubt."

415 Md. at 184. (Emphasis supplied).

The Court of Appeals fully explained, 415 Md. at 185, moreover, why this has to be

the single test and why the now discarded rule of <u>West</u> simply makes no logical sense.

> "Because <u>the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony</u>, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence. We defer to the jury's inferences and determine whether they are supported by the evidence.
>
> "<u>That standard applies to all criminal cases, regardless of whether the conviction rests upon direct evidence, a mixture of direct and circumstantial, or circumstantial evidence alone</u>."

(Emphasis supplied; citations omitted). The problem with even that small fragment of <u>West</u>

preserved by the curative efforts of <u>Wilson</u> is that it would strip the jury of its undeniable

prerogative of choosing between rational inferences, guilt or innocence.

Notwithstanding the unmistakable resolution of this issue in <u>Smith v. State</u>, the

appellant in <u>Martin v. State</u>, 218 Md. App. 1, 34, 96 A.3d 765 (2014), attempted to resurrect

the ghost of <u>West</u> and <u>Wilson</u>.

> "<u>Martin further asserts that</u>, although 'it might be reasonable for a finder of fact to conclude that these facts [as summarized] could be consistent with [his] guilt, <u>it simply is not the case they are inconsistent with every single reasonable theory of his innocence</u>.' <u>He then asks us to apply the standard articulated in Wilson v. State</u>, where the Court of Appeals

stated that 'a conviction upon circumstantial evidence <u>alone</u> is not to be sustained unless the circumstances, take together, are inconsistent with any reasonable hypothesis of innocence."

(Emphasis supplied; citation omitted).

Speaking for this Court, Chief Judge Krauser decisively struck down, 218 Md. App. at 35, the effort to continue to consign circumstantial evidence to a disfavored position.

"<u>Martin's reliance on Wilson and its progeny is misplaced</u>. First of all, 'Maryland has long held that there is no difference between direct and circumstantial evidence.' It is, in fact, now an axiom of law that '<u>[n]o greater degree of certainty is required when the evidence is circumstantial than when it is direct</u>, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused."

(Emphasis supplied; citation omitted). The <u>West-Wilson</u> formulation was squarely repudiated.

"And, contrary to what Martin claims, <u>circumstantial evidence 'need not be such that no possible theory other than guilt can stand</u>.' That is to say, '<u>[i]t is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence</u>, or produce an absolute certainty in the minds of the jurors."
218 Md. App. at 35. (Emphasis supplied).

Our decision in <u>Martin</u> was solidly based on the final resolution of this theretofore troubling issue by the Court of Appeals in <u>Smith v. State</u>.

"Indeed, <u>as the Court of Appeals recently noted</u> that, <u>notwithstanding the 'reasonable hypothesis of innocence' language in Wilson and succeeding cases</u>, 'it is well established' that <u>the standard that Martin 'champions' is not</u> 'the focus of <u>the standard to be applied</u> when reviewing the sufficiency of the evidence in criminal cases.' <u>Smith</u>, 415 Md. at 183. <u>Appellate courts, it warned, should not 'second-guess the jury's determination where there are competing rational inferences available</u>."

<u>Id</u>. (Emphasis supplied). As Gertrude Stein might have said, "An inference is an inference an inference" and one is not to be favored over another.

If this vexatious relic from West v. State has at long last been exorcized, it is about time. From the beginning, it was a misbegotten effort to take a perceived problem involving the burden of persuasion and to seek the solution in the burden of production. To require a judge, ruling on legal sufficiency, to determine whether a hypothesis of innocence is or is not reasonable is, by definition, to impose upon the judge a persuasion issue when he is addressing a production issue. It was an unworkable mix and it is no longer with us. R.I.P.

As we conclude our analysis of this issue, it would appear that the appellant herself lacks full confidence in her contention. In neither appellate brief nor reply brief does she, in the course of discussing this issue, so much as mention the landmark decision of the Supreme Court in Holland v. United States (1954). Nor is there mention of the more recent and dispositive decision of the Court of Appeals in Smith v. State (2010) or of this Court's recent reaffirmation of Smith in Martin v. State (2014). In completely unilluminating fashion, the appellant simply throws out the names of West (1988) and Wilson (1990) and lets it go at that. There is no argument as to whether or not those cases are still good law or, if arguendo they happen to be, how they might be applicable to the facts in this case. Nor does the appellant suggest why this issue was not ever raised when she moved for a judgment of acquittal at the end of the trial. In any event, we are unpersuaded by the contention.

### An Unpreserved Jury Instruction Claim

In rejecting the appellant's third contention, we are content to rely upon the preservation requirement. The appellant now contends that the trial judge erroneously failed to instruct the jury with respect to 1) the Good-Faith Claim of Right defense to a

30

charge of theft and 2) the Honest Belief defense to theft, both of which defenses are set out at Maryland Code, Criminal Law Article, § 7-110(c).

During the initial instruction to the jury, the court explained the two defenses in language that essentially tracked the language of the statute.

> "I'm also going to give you an instruction on an allowed defense, because it is a defense to the crime of theft that the defendant acted under a good faith claim of right to the property involved.

> "It's also a defense that the Defendant acted in the honest belief that the Defendant had the right to obtain or exert control over the property as the Defendant did…"

The appellant offered no objection to the instruction. During the course of the jury deliberations, the jury sent a note to the court requesting a reinstruction on the subject of theft by unauthorized control. At the request of counsel for the appellant, the court also added the following reinstruction on both the good-faith claim of right defense and the honest belief defense.

> "It is a defense to the crime of theft that the Defendant acted under a good faith claim of right to the property involved.

> "And two, that the Defendant – this is or, I should say, or the Defendant acted in the honest belief that the Defendant had the right to obtain or exert control over the property as the Defendant did."

On this occasion as well, the appellant lodged no objection. This failure to object is dispositive of the issue. Maryland Rule 4-325 deals with "Instructions to the Jury." Subsection (e) unequivocally provides, in pertinent part:

> "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."

Nothing more need be said.

## Post-Trial Motions for a New Trial

The appellant finally claims that Judge Lombardi twice abused his discretion in denying the appellant's motions for a new trial. Both motions for a new trial were brought pursuant to Maryland Rule of Procedure 4-331. The first of these subcontentions is based on Rule 4-331(a), which provides:

> "On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial."

With respect to the first subcontention, we not only do not agree with it; we are unable even to comprehend what it is alleging. The trial concluded on September 22, 2015. Eight days later, an investigator for the appellant met with Phillip Anderson, an original defendant in this case who had turned State's Witness and testified for the prosecution. We will here set out the single paragraph of the appellant's brief in which she explains the basis for her post-trial Motion for a New Trial and in which she makes the sum total of her legal argument in support of the motion.

> "On September 30, 2015, prosecution witness Phillip Anderson met Ross' investigator at the Anne Arundel County Detention Center. <u>Anderson revealed that he never knew Ms. Ross, that his conspiracy that defrauded Sears included no women</u>, and that "male prostitutes", including Anderson, made up the conspiracy that used credit card fraud to steal televisions from Sears. Accordingly, <u>Teresa Ross filed</u> on October 2, 2015, a [R]ule 4-331(a) <u>motion alleging that the prosecution illegally concealed Anderson's exculpatory information that proved Ross' innocence</u>. However, Judge Lombardi denied Ms. Ross' [R]ule 4-331(a) motion while refusing to hear Anderson's testimony that exonerated Ross."

(Emphasis supplied).

32

In no conceivable sense could Anderson's proffered exculpatory testimony be deemed to be newly discovered evidence. He testified fully at trial and was subject to extensive cross-examination. On the subject of defense counsel's due diligence in discovering what Anderson would say about knowing the appellant, counsel was asked why he did not ask Anderson about that during cross-examination. His explanation was that he did not ask the question because he did not know what Anderson's answer would be.

> "[DEFENSE COUNSEL]: And my colleague asked Mr. Anderson who was Teresa. And Mr. Anderson said I don't know Teresa. I don't know Teresa. Now with that, I didn't ask anything because I didn't know what Mr. Anderson would say."

(Emphasis supplied).

Notwithstanding that extraordinary lack of diligence, appellant's counsel was given the answer anyway. The precise question that appellant's counsel failed to ask was asked by co-counsel for the co-defendant Belcher. Anderson answered that he did not know the appellant and that, to his knowledge, no women were involved in the conspiracy to steal from Sears. What is now alleged to be newly discovery evidence remains a mystery to us. We are equally in the dark about the bald allegation that "the prosecution illegally concealed Anderson's exculpatory information that proved Ross's innocence." In any event, we see no merit in the subcontention.

The second of the two subcontentions charges the denial of a Motion for New Trial based on newly discovered evidence pursuant to Maryland Rule 4-331(c)(1), which provides:

33

"(c) **Newly Discovered Evidence**. The court may grant a new trial or other appropriate relief on the ground of <u>newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule</u>:

"(1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post-conviction relief[.]"

(Emphasis supplied).

What the appellant brings before us with this particular sub-contention is a ruling on what purports to be a Motion for New Trial based on newly discovered evidence. Our consideration of the appellant's argument will be based on such a motion and on what such a motion requires. We expressly decline to be as open-ended and as free-wheeling as the appellant would like us to be.

We hold that Judge Lombardi was not in error in denying the Motion for New Trial filed by the appellant on April 13, 2015. That motion was not some omnibus motion capable of raising for consideration any concern that the appellant may have had with her conviction. It was not a motion aimed at trial error generally. It is a very special and limited type of motion that focuses exclusively on newly discovered evidence that not only was not discovered earlier but that could not have been discovered earlier even by due diligence.

In this case, however, the appellant was, in effect, asking the trial court to reconsider an issue that the trial court had earlier rejected. The appellant, however, never made that clear because she gave her recycled motion a new name. On the day of the appellant's sentencing, January 15, 2015, she had raised what she at that time called a "due process" issue. She claimed that "State's Exhibit 1," at trial, had been an elaborate fraud full of

34

totally false information. In essence, Sears had furnished the State with elaborate and detailed business records. The State constructed and then magnified most of that data onto a large visual display for forensic purposes. The State simply prepared a chart, as a large visual display, in order to communicate its message effectively to the jury. The chart was not offered as a business record and no one ever suggested that it was.

At trial, the appellant accepted State's Exhibit 1 without objection. There had also been placed in evidence by the appellant, the detailed business records from Sears, designated as "Ross Exhibit 1." With respect to the State's Exhibit, the appellant had been shown the exhibit before it was received in evidence and she had no problem with it. The full exchange was:

> "THE COURT: Are you okay with this?
>
> "[DEFENSE COUNSEL]: Can we approach just quickly?
> "THE COURT: On this exhibit?
>
> "[DEFENSE COUNSEL]: Yes. We have talked. I just want to make sure we have an understanding. Thank you, Judge.
>
> "(Counsel approached the bench and the following ensued)
>
> "THE COURT: You all right with this exhibit?
>
> "[CO-DEFENDANT COUNSEL]: Yes.
>
> "THE COURT: Have you seen it?
>
> "[CO-DEFENDANT COUNSEL]: Mm-hmm.
>
> "THE COURT: What's your problem?
>
> "[DEFENSE COUNSEL]: I just want to make sure we put on the record, <u>Ms. Ross is okay with the use of this</u>.

"THE COURT: What?

"[DEFENSE COUNSEL]: <u>Ms. Ross is okay with the use of this exhibit</u>. We have a similar exhibit that's more comprehensive that's also admitted. So we're – so that's what I'm saying. I just want to be clear what we're doing.

"THE COURT: You don't have to jump up here and tell me that. Let's go."

(Emphasis supplied).

The "due process" motion at the time of sentencing claimed that there were some discrepancies between the two exhibits. The chart, the enlarged visual display that was Exhibit 1, had never been offered as a business record. It had simply been created out of data that was in the business record. It was the opinion of Judge Lombardi (and of this Court), moreover, that the discrepancies were not of any real significance. The appellant nonetheless exhausted an entire thesaurus entry of such condemnatory terms as "deceitful," "fraudulent," and "fabrication." In any event, the merits of Judge Lombardi's dismissal of that motion are not before us. He dismissed the motion on January 15, 2015, and, right or wrong, no appeal has been taken from that dismissal. The appellant may not now relitigate it under the label of a different motion. The appellant, however, tried mightily to do so.

The exact same issue based on exactly the same allegations, resurfaced on April 13, 2015, as a Rule 4-331(c) Motion for New Trial based on newly discovered evidence. None of the evidence on which the motion was based, however, was newly discovered. All of the data had been before the trial court in the form of the two exhibits. The appellant had but to compare them to each other to note any discrepancies. The custodian of business records for Sears, William Samuels, testified at the trial and was fully available for

36

questioning, at trial or pre-trial, by the appellant. Whatever William Samuels told the appellant on April 13, 2015, or in an affidavit on February 3, 2015, he could just as readily have told the appellant at trial, if he had been asked. The appellant does not even mount an argument in this regard and simply ignores the entire issue of due diligence. When dealing with Rule 4-331(c), however, due diligence may not be ignored.

In no sense was any of the information about Sears' business records newly discovered evidence. It appears to have been actually in the hands of the appellant. The evidence was simply not newly discovered. A fortiori, it is certainly not evidence that with due diligence could not have been discovered. In a Rule 4-331(c) motion, there is an absolute burden on the moving party to prove 1) that the evidence was not earlier discovered and 2) that even with due diligence it could not have been earlier discovered. To put it bluntly, even if the appellant's present issue might have been a Nobel Prize winner in other regards (it was not), it would still be a loser as a Motion for New Trial based on newly discovered evidence. The official designation of a motion and the procedural requirements of such a motion are of dispositive significance. Even Hamlet might flop if marketed as Anne of Green Gables.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**