*Malcom Hasaunn Martin-Dorm v. State of Maryland*, No. 0055, September Term 2022. Opinion by Moylan, J.

**HEADNOTE:**

**A TIGHTLY INTERWOVEN WEB OF ENMESHING CIRCUMSTANCES – THE PROBATIVE QUALITY OF CIRCUMSTANTIAL EVIDENCE – THE REPLACEMENT OF A JUROR – THE SIGNIFICANCE OF AMBIGUOUS BEHAVIOR IS IN THE EYE OF THE BEHOLDER – IT WAS NOT OUR CALL TO MAKE – MERE WORDS DO NOT COMMUNICATION MAKE – LACK OF APPELLATE PRESERVATION – THE NOTICE OF PLAIN ERROR – SENTENCING CREDIT FOR TIME SERVED – AN EXERCISE OF DISCRETION – NON-PRESERVATION AGAIN – THE NOTICE OF PLAIN ERROR AGAIN: AN APPELLATE MULLIGAN – A FAR-FLUNG PERIPHERAL ISSUE: INEFFECTIVE ASSISTANCE OF COUNSEL – A CURIOUS JUXTAPOSITION**

Circuit Court for Washington County
Case No. C-21-CR-18-000464

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 0055

September Term, 2022

_____

MALCOLM HASAUNN MARTIN-DORM

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Friedman,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: September 5, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

The appellant, Malcolm Martin-Dorm, was convicted in the Circuit Court for Washington County by a jury, presided over by Judge Andrew F. Wilkinson, of second-degree murder and related offenses. On this appeal, he raises the four contentions:

1. **That circumstantial evidence was not legally sufficient to support his conviction for second-degree murder;**

2. **That Judge Wilkinson abused his discretion by dismissing, over defense objection, an empaneled juror who had social media ties with the appellant's family;**

3. **That Judge Wilkinson's allegedly <u>ex parte</u> communication with a juror constituted plain error; and**

4. **That Judge Wilkinson abused his discretion by failing to grant the appellant credit for pre-trial time served on a separate offense.**

## A Tightly Interwoven Web Of Enmeshing Circumstances

The fatal stabbing in this case occurred on May 27, 2018, at or just moments before 12:54 A.M. just outside Christopher's Bar and Grill on Franklin Street in Hagerstown. Because no witness saw the actual stabbing, the case against the appellant was a circumstantial case, albeit a very strong one. Accordingly, the timeline is especially important. We can establish the stabbing as having occurred at just a minute or two before the 12:54 A.M. call to the police reporting a possible stabbing. Hagerstown City Police Officer Tom Wolfe found the badly wounded Juan Martinez Marroquin lying on the ground in a pool of blood. Marroquin was suffering from two stab wounds to his back. Paramedics soon arrived and placed Marroquin in an ambulance. Marroquin inquired whether the police had caught the man who stabbed him. When Officer Wolfe asked Marroquin if he knew who had stabbed him, he replied, "Yes," but the rest of his response was garbled.

Marroquin died on his way to the hospital. The official cause of death pronounced that either stab wound could have been fatal.

A key witness for the State was Nicole Little, a bartender at Christopher's Bar and Grill. She testified that Marroquin was a customer who had ordered food and drink that night. She also identified the appellant as being at the bar that night. The appellant initially tried to order a drink but Ms. Little refused to serve him because he appeared to be underage and did not have an ID card. The appellant asked whether it would be alright if Marroquin would buy a drink for him, but Ms. Little said that that would not be permitted. She testified that the appellant "seemed okay" after that exchange. It was thus established both that the appellant was in Christopher's Bar and Grill on the night of the murder and that there had been a relationship between the appellant and the murder victim.

A second key witness was Ernest "Pancho" Davis, Jr., another employee of Christopher's who greeted people at the door of the bar, cleaned up, and entertained customers. He testified that, as he was standing outside that night, a man whom he knew as "X" asked him for a cigarette. Mr. Davis did not have a cigarette. "X" asked Mr. Davis to go inside and to tell "Omego" to bring him one. Mr. Davis went inside and told Marroquin, "The guy on the porch wants a cigarette." With that exchange, Mr. Davis went back outside. Thirty seconds after leaving the bar, Mr. Davis heard a commotion. When he walked back to the door of the bar, he saw a man lying on the ground. He called 911.

Immediately before calling 911, Mr. Davis saw someone running catty-corner on Mulberry Street. He was asked by the police to identify the man he saw running. At trial, Mr. Davis testified, "It looked like someone that could possibly be a guy I know as 'X,'

2

but I can't say for sure. He was running away from me and I couldn't see his face." When interviewed initially by the police, Mr. Davis, via a photo lineup, had identified "X" as the appellant. At trial, however, Mr. Davis reneged on his identification of the appellant. But Mr. Davis did acknowledge that he had earlier told the police that he was "about 80% certain" about his identification of the appellant.

Christina Boward was on her way to work that night when she saw a man running through a nearby alley who was holding an object that looked like a gun or a knife. She described the man as a dark-skinned man about six feet tall, wearing dark clothing, hair in dreadlocks or twists, and heavyset. When Ms. Boward reached Franklin Street, she noticed a man on the ground and bleeding.

A surveillance video inside the bar showed the appellant inside the bar and talking to Marroquin between 12:18 and 12:22 A.M. That corresponded with the testimony of Nicole Little. The appellant left the bar at 12:25 A.M. The video next showed Mr. Davis coming into the bar and talking to Marroquin at 12:50 to 12:51 A.M. After that exchange, Marroquin walked out of the bar at 12:52 A.M. That corresponded with the testimony of Ms. Davis. The first call to the police about a stabbing was at 12:53 A.M, within a minute of the time that Marroquin walked out of the bar.

An outside surveillance camera showed a person running north on Mulberry Street near the bar just moments before the first call came in to the police. That person had a baseball hat in his left hand and a metallic object in his right hand. He was wearing a black sweatshirt or long-sleeved jacket around his waist. When the appellant first came into

Christopher's Bar and Grill that night, he was wearing a baseball hat and a long-sleeved jacket or sweatshirt.

Hannah Eavy testified to a communication she partially overheard between her boyfriend and the appellant in late May of 2018. The stabbing had been in the early morning hours of May 27, 2018, just several days earlier. What initially caught her attention was her boyfriend's response to something told to him by the appellant as "crazy." In a video interview with the police, which she later denied, she stated that she heard the appellant state that he had had an argument with someone at a bar, that the other party had told the appellant to "get out of his face," and that the appellant had then stabbed that other person a couple of times.

Desirae Kline also testified to overhearing a conversation between the appellant and another man at some time in late May or early June of 2018 in which the appellant acknowledged that he had gotten into an argument with someone on Mulberry Street that escalated into a physical fight.

Detective Tony Fleegle first interviewed the appellant on June 10, 2019. The appellant initially denied any knowledge about the stabbing. He acknowledged that he had been at Christopher's on the night of the stabbing but he then changed his mind and said that he had not been there that evening.

When the appellant was formally arrested on June 18, 2019, he again agreed to speak with the police investigator. He admitted to having been at Christopher's Bar and Grill on the night of the stabbing, but insisted that his presence there had been about 30 minutes before the stabbing. The appellant's time estimate was contradicted by the timing of the

4

surveillance footage and the testimony of Ernest Davis. He also admitted that he ran away from the area of Christopher's that evening, but insisted that he only ran because he had heard that "someone was stabbing people." The appellant also acknowledged that at the time of the stabbing he had had short dreads or twists although he no longer had them as of the time of his arrest.

## The Probative Quality Of Circumstantial Evidence

The appellant's motion for a judgment of acquittal was based exclusively on the fact that there was no direct eyewitness to the stabbing itself and no scientific evidence linking him to the murder:

> **MR. INSLEY:** I'll make a Motion for Judgment of Acquittal. The basis of the motion is [that the State's case] lacks factual allegations that Mr. Martin-Dorm committed the acts. <u>There's no witnesses produced that said they saw him committing the acts and there was no scientific evidence connecting him to the acts</u>. And with that, I will submit.

(Emphasis supplied.) The appellant thus mounts a categorical challenge to circumstantial evidence as inherently insufficient to support a conviction in and of itself. He contends that his conviction cannot be based on circumstantial evidence alone.

Judge Wilkinson denied the appellant's motion for a judgment of acquittal. We agree with the appellant that technically this was, indeed, a circumstantial case, albeit an overwhelmingly persuasive circumstantial case. We do not agree with the appellant, however, that that makes an iota of critical difference. As the Supreme Court of Maryland announced in <u>Gilmore v. State</u>, 263 Md. 268, 292-93, 283 A.2d 371 (1971):

> <u>The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred</u>. <u>No greater degree of certainty is required when the evidence is circumstantial</u>

than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused.

(Emphasis supplied.) *See also* Hebron v. State, 331 Md. 219, 226, 627 A.2d 1029 (1993) ("Maryland has long held that there is no difference between direct and circumstantial evidence.").

This Court spoke to the same effect in Ross v. State, 232 Md. App. 72, 98, 155 A.3d 943:

> Even in a case resting solely on circumstantial evidence, and resting moreover on a single strand of circumstantial evidence, if two inferences reasonably could be drawn, one consistent with guilt and the other consistent with innocence, the choice of which of these inferences to draw is exclusively that of the fact-finding jury and not that of a court assessing the legal sufficiency of the evidence.

(Emphasis supplied.)

This strong web of circumstantial evidence in this case was clearly ready grist for the jury's factfinding mill. From all of the circumstances, the inference of guilt was undeniable. We affirm Judge Wilkinson's decision to deny the motion for judgment of acquittal. The fact that the evidence could be characterized as "circumstantial" is beside the point.

### The Replacement Of A Juror

The appellant's second contention concerns the discretionary authority of a trial judge to replace a sitting juror with one of the alternate jurors after the sitting juror expressed concerns about continuing to sit on the case. On the second day of the trial, Juror 49 told a bailiff that he recognized certain persons in the courtroom. Alerted by the bailiff,

6

Judge Wilkinson called Juror 49 to the bench and voir dired him about the matter. A transcript of that examination revealed the following:

> THE COURT:     Okay, when we broke last night, you stopped my bailiff and you told him a concern that you had that maybe you knew some of the folks who were sitting in the courtroom. Is that right?
>
> THE COURT:     Do you know the Defendant? Have you ever known him?
>
> JUROR 49:     No, Sir.
>
> THE COURT:     Okay. And without pointing them out or anything, u'm – there were – there were multiple people here that were sort of – it was three younger African American women – uh – I would say more of a middle-aged African American male and then there were two younger Caucasian women that walked in, sat down for a while, and then left. Which – which people are you telling me about?
>
> JUROR 49:     One is the – one of the Caucasian women. And then, there were a few of the African American women –
>
> THE COURT:     Okay. I think the Caucasian woman is somebody that might be an attorney for one of the offices downtown. I don't think they're family of the Defendant, okay?
>
> JUROR 49:     Okay.
>
> THE COURT:     The other young ladies, I think they might be family of the Defendant, okay?
>
> JUROR 49:     Okay.
>
> THE COURT:     Can you describe to me how it is that you know them, or you think you know them?
>
> JUROR 49:     Actually – u'm – I went to high school with them…
>
> THE COURT:     Were you ever friends with them or you just went to the same high school?
>
> JUROR 49:     I wouldn't say friends, but we knew of each other.

7

THE COURT:        Okay.

JUROR 49:         U'm – kind of like – the name brand in my school.

THE COURT:        Well like – uh – did you hang out with those girls
outside of school?

JUROR 49:         No, Your Honor.

THE COURT:        What was your relationship with them in school?

JUROR 49:         See, it's kind of hard to explain. Like, we were friends,
but at the same time, we weren't acquaintances actually.

THE COURT:        Did you know anything about them outside of school or
about their family?

JUROR 49:         I knew what some of them do outside of school, but
that's about it.

THE COURT:        Well, what do you mean about what they do?

JUROR 49:         Like, one of those girls – u'm – does make-up.

THE COURT:        Okay.

JUROR 49:         I mean, some of them went to college.

THE COURT:        Alright do you, through social media, still connect with
them in any way?

JUROR 49:         Yes, Sir.

THE COURT:        Are you Facebook friends or Instagram friends or
Snapchat friends?

JUROR 49:         Instagram.

THE COURT:        Okay. So they are in your friend group on Instagram and
you're in theirs?

JUROR 49:         Yes, Sir.

8

THE COURT: Do you have communication with them on a somewhat regular basis? Or –

JUROR 49: No, Sir.

THE COURT: Okay. Did you ever hear them talk about a family member of theirs named Malcolm?

JUROR 49: No, Sir.

THE COURT: Okay. <u>Do you think that your knowledge of those girls, and that they are Instagram friends, could cause you difficulty being one hundred percent fair and impartial in this case?</u>

JUROR 49: U'm – <u>I'm sorry, can you repeat that one more time?</u>

THE COURT: <u>The fact that you know some of these girls, and you are Instagram friends</u> – and <u>so you have some sort of social media connection to them, are you certain that you can be one hundred percent fair and impartial to both sides in this case</u>?

JUROR 49: <u>Yes, Your Honor. It's just awkward.</u>

(Emphasis supplied.)

The prosecutor moved to have Juror 49 replaced by an alternate juror "out of an abundance of caution." The appellant objected to the replacement because Juror 49 had noted that, notwithstanding the connection that made him feel "awkward," he could still be "one hundred percent fair and impartial" in reaching a verdict. Judge Wilkinson, in his discretion, ruled that Juror 49 would be excused and replaced by the first alternate juror:

THE COURT: Okay, uh – my decision is that he is going to be removed, and the reason is – uh – <u>there is a social media connection, at a minimum, between him and several of the family members</u>. U'm – <u>my experience with young people</u> who – uh – following each other on Instagram or social media, friends of any sort, <u>is that they know each other fairly well</u> – uh – <u>they know a lot about each other's lives</u>. It is incredible what technology does and – uh – I believe he, although he asked me to repeat the question, he – <u>he paused</u>

9

very – pretty significantly when I asked him the fairness question, and I could see him thinking about it, and I don't blame him for – uh – whether – for this situation. I just don't think it is appropriate for – uh – for social media friends – uh – to be involved in any way, with respect to this jury. And so, I am going to excuse him and our next juror will be – I believe it's number seventy-seven, is my first alternate.

(Emphasis supplied.)

Maryland Rule 4-312 (g)(3) deals with precisely the situation facing Judge Wilkinson:

> (3) Discharge of Jury Member. At any time before the jury retires to consider its verdict, the trial judge may replace any jury member whom the trial judge finds to be unable or disqualified to perform jury service with an alternate in the order of selection set under section (e). When the jury retires to consider its verdict, the trial judge shall discharge any remaining alternates who did not replace another jury member.

(Emphasis supplied.)

The Rule "does not define the circumstances under which a juror shall 'become unable or disqualified' to perform his duties." James v. State, 14 Md. App. 689, 699, 288 A.2d 644 (1972).[1] Each case must be evaluated on a case-by-case basis. A trial judge's decision to remove a seated juror is a discretionary one and will not be reversed on appeal absent a clear abuse of discretion or a showing of prejudice to the defendant.

To keep this entire issue in meaningful perspective, it behooves us to look initially at State v. Cook, 338 Md. 598, 659 A.2d 1313 (1995). The replacement of a seated juror with a qualified alternative juror does not in any way compromise the defendant's "valued right to have his trial completed by a particular tribunal." Cook, 338 Md. at 614. That

---

[1]    James v. State was an analysis of former Maryland Rule 748, an earlier version of what is now Rule 4-312.

valued right is not in jeopardy and does not "apply to a situation where a seated juror is replaced with an alternate who has undergone the same selective process as the seated juror and has been present for the entire trial" Id. A defendant "has a right to a fair and impartial jury" but not "a right to a jury composed of particular individuals." Id.

When, therefore, a judge excludes a juror on grounds "which are particular to the juror," a reviewing court extends great deference to that discretionary determination. The reviewing court will not substitute its judgment for that of the trial court unless the trial court's decision is "arbitrary and abusive and results in prejudice to the defendant." The appellant has not remotely suggested how he was prejudiced by the jury that ultimately decided his case. It is his obligation to show us some prejudice resulting from the substitution of the alternate juror for the juror who was removed. He has not done so.

## The Significance Of Ambiguous Behavior
## Is In The Eye Of The Beholder

Ironically, in making, fervently, the argument that Judge Wilkinson could have and, in the judgment of the appellant should have, not dismissed Juror 49 from the panel, the appellant actually makes a strong argument in support of our conclusion that Judge Wilkinson did not commit reversible error. The appellant's argument simply illustrates how vast is the discretion available to the judge. In arguing how factually ambiguous evidence can be interpreted so as to support conclusions going in opposite directions, the appellant's argument supports the wisdom of appellate deference to discretionary decisions by trial judges.

Frequently, the same precise item of evidence can be a two-edged sword. When Judge Wilkinson, for example, asked Juror 49 whether he was 100% certain that he could be fair and impartial, Juror 49 hesitated for an appreciable period of time before answering that he was certain that he could. It is easy to read into such an ambiguous moment of hesitation whatever message one hopes to hear. The State interpreted the hesitance as evidence of uncertainty and doubt. The appellant, on the other hand, interpreted the hesitation as a carefully considered affirmation of certainty. Either message was plausible. Who, then, should make the call? This precise issue was before this Court in Morris v. State, 153 Md. App. 480, 502-03, 837 A.2d 248 (2003):

> What does the assertion "I probably could" mean? It might well mean different things and the reading of a cold record will not reveal what it means. The judge on the scene, face to face with the juror and immediately after engaging in an extended exchange with the juror, is infinitely more able than we to make such a determination. The words used are but a small part of the raw material that goes into making such a decision. There is body language. There is tone and force of voice. There is eye contact or lack thereof. There is firmness of intonation and quickness of speech versus equivocation and hesitation. It is a commonplace that different actors can impart diametrically different meanings into precisely the same written lines. The sentence "I probably can" delivered by a Wally Cox or a Don Knotts may well communicate hesitation and doubt. The sentence "I probably can," particularly when repeated twice, delivered by John Wayne or by Douglas McArthur might well, by contrast, communicate resolution and iron determination. In the children's classic *The Little Engine That Could*, the inspirational refrain, "I think I can. I Think I Can. I THINK I CAN!!" is the exemplar, not of doubt and hesitation, but of gritty and not-to-be-denied determination. Judge McCurdy heard the lines as they were delivered; we did not.

(Emphasis supplied.) Judge Wilkinson sat face to face with that tense moment of emotionally charged hesitation. We never did. Either call was a discretionary option. We humbly defer.

12

What the appellant argues is that if, on the very facts in this case, Judge Wilkinson had reached the opposite conclusion, to wit, that Juror 49 should not have been replaced, such an opposite conclusion would also have been affirmed as not having been an abuse of discretion. We fully agree with the appellant on that score. Had Judge Wilkinson decided not to dismiss Juror 49, he just as surely would have been affirmed as having operated within his discretionary range. Having decided the exact opposite, however, to wit, that Juror 49 would be excused and replaced, he will also just as surely be affirmed as having operated within his discretionary range. The argument that discretion should have been exercised in one direction rather than in the opposite direction falls on deaf ears at the level of appellate review. Just as we would have been deferential to a discretionary call that went the appellant's way, we are similarly deferential to the discretionary call that did not go the appellant's way. The significance of ambiguous behavior is in the eye of the beholder. Appellate review is especially deferential, moreover, when the eye of the beholder is also that of the trial judge. We defer to a discretionary decision that goes in either direction.

## It Was Not Our Call To Make

The appellant nonetheless argues before us as if we were making the discretionary decision. We, of course, are not and such argument before us is pointless. The hesitation and the ultimate response were enigmatically ambiguous. It was not an abuse of discretion, whichever way the ambiguity was resolved, so there is no point in arguing that it should, as a discretionary matter, have tilted in one direction rather than in another. Even if we disagreed with Judge Wilkinson's decision (we do not), we could not say that his call was

13

an abuse of his discretion. We are dealing, moreover, with his discretion, not ours. We affirm.

## Mere Words Do Not Communication Make

### QUESTION: "CAN WE HAVE A CONVERSATION?"
### ANSWER: "NO!"

**Query:** Is the above passage a "communication," albeit a brief one, within the contemplation of Rule 4-326(d)(2)(C)?

**Response:** No! It is no more a "communication" than if the judge had simply shaken his head from side to side on a horizontal axis or had turned and walked away without saying or doing anything. It is no more a communication than if the judge had sneezed and a juror had instinctively responded, "Gesundheit." A communication per Rule 4-326 is more than an exchange of words.

On the third day of the trial, the jury was sent back to the jury room to begin its deliberations at about 2:30 P.M. The court did not officially reconvene on the record until 6:50 P.M. At that point, on the record, Judge Wilkinson provided a summary of events that had occurred during the intervening hours that had been off the record:

> At approximately 4:15 the jury made a request to see some of the videos again. Based on a procedure that was agreed between me and the attorneys. My Bailiff and I entered courtroom number 1 which was the jury room and asked the jury what videos they wanted to see. It was explained they wanted to see three videos of three of the witnesses. <u>As I was preparing to leave in order to get the attorneys so that we could follow our procedure one of the jurors asked what happens if there's a hung jury. And I indicated to the jury that I could not answer that question.</u> I then re-entered the courtroom with my Bailiff along with Mr. Debes and Mr. Insley, the prosecutor and the defense attorney, where three of the videos were played for the jury as they had requested. Two of the videos they watched one time. One of the videos they watched two times at their request. I asked the jury if they needed to see the videos anymore and their answer was no.
>
> Later at approximately 6:00 P.M. unsure whether the jury wished to continue for the night or whether they wished to retire and go home and then return tomorrow at 9:00 A.M. I wrote the jury a note. I discussed it with counsel

14

before sending the note. Counsel agreed that the note could be sent. They read, both counsel read the note and agreed to its form and substance. The note read, "From the Judge, do you wish to continue deliberation for thirty or forty-five more minutes or do you wish to end for the evening and come back tomorrow at 9:00 A.M. to continue deliberations?" The response that I received back from the jury is that they wished to stay and continue their deliberations.

(Emphasis supplied.) Our only concern is with the brief underlined snippet.

Counsel for both the State and the appellant fully approved of how Judge Wilkinson had handled the jury. Significantly, the appellant raised no objection whatsoever with respect to how the judge had handled the juror's question about what would happen if the jury were hung. It is only in hindsight that it has attracted anyone's attention. The appellant, however, now claims that the judge violated Rule 4-326(d)(2)(c), which provides:

> (c) If the judge determines that the communication pertains to the action, the judge shall promptly, and before responding to the communication, direct that the parties be notified of the communication and invite and consider, on the record, the parties' position on any response. The judge may respond to the communication in writing or orally in open court on the record.

(Emphasis supplied.)

We reject the appellant's argument for several reasons, If the merits of the issue were ultimately before us (they are not), we do not agree that Rule 4-326(d)(2)(c) was ever violated. We do not believe that Judge Wilkinson's response to the jury that he would not respond to a question about a hung jury amounted to a "communication" that "pertains to the action" contemplated by the Rule. Nothing of substance was remotely discussed. In any meaningful sense, a decision not to communicate is not such a communication. This contention would not succeed on the merits, if the merits were properly before us. They are not. In this case there was no communication about a hung jury.

15

**Lack Of Appellate Preservation**

This tentative discussion of the merits, however, is beside the point. Once the appellant became aware that the issue had arisen, he had no objection whatsoever to how Judge Wilkinson had handled the matter. Maryland Rule 8-131(a) provides that ordinarily "the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." In Morton v. State, 200 Md. App. 529, 537-38, 28 A.3d 98 (2011), this Court held that a claim raised under Maryland Rule 4-326 was waived where defense counsel "did not object or otherwise comment on the judge's decision not to communicate with the remaining jurors regarding [an alternate juror's] note." The issue was not preserved for appellate review.

**The Notice Of Plain Error**

Acknowledging his failure to have preserved the issue for appellate review, however, the appellant takes a step into the abstract world of make-believe and asks us, in our discretion, to overlook non-preservation and to take cognizance of plain error. He blithely ignores what a rare and extraordinary form of relief plain error notice actually is and treats it instead as if it were just a normal and standard variety of procedural relief. We decline to do so. As we explained in Morris v. State, 153 Md. App. 480, 506-07, 837 A.2d 248 (2003):

> "We decline to do so." That five-word holding disposes of the contention. All else is *dicta*. Ordinarily, those five words are all that would be said and all that need be said, for the exercise of our unfettered discretion in not taking notice of plain error requires neither justification nor explanation.

16

(Emphasis supplied.) *See also* <u>Garner v. State</u>, 183 Md. App. 122, 152, 960 A.2d 649 (2008); <u>Myers v. State</u>, 243 Md. App. 154, 186-87, 219 A.3d 534 (2019). We will scrupulously restrict our review to a review of the trial that was and not of the trial that might have been.

## Sentencing Credit For Time Served

For the second-degree murder of Juan Martinez Marroquin, Judge Wilkinson sentenced the appellant to a term of forty years in prison. That sentencing took place on March 2, 2022. The only issue before us in this contention is the extent to which the appellant was entitled to credit on that sentence for some or all of the time that he had already served in custodial detention between his initial arrest on June 19, 2018 and his sentencing on March 2, 2022. That pre-sentencing period amounts to a grand total of 1,353 days.

The complicating factor is that in the course of that period of 1,353 days, a very significant intervening act occurred that split the larger period of pre-sentencing incarceration into two distinct and legally very different sub-periods. On August 30, 2021, the appellant entered a guilty plea to a charge of second-degree assault on a fellow prisoner in the detention center. On that totally unrelated charge, the appellant began serving his sentence on that very day, August 30, 2021. The appellant's period of pre-sentencing incarceration in the case now before us thus breaks down into one sub-period of 1,169 days – from June 19, 2018 to August 30, 2021 – when his sole predicate for incarceration was the disposition of the case now before us. A second sub-period of 184 days of pre-sentencing incarceration followed – from August 30, 2021 to March 2, 2022 – when he

17

received his ultimate sentence of forty years of incarceration. During that second sub-period, however, the primary basis for the appellant's incarceration had dramatically shifted. In addition to awaiting trial in the present case, he was also beginning to serve a sentence for a second and totally unrelated crime.

Maryland Code, Criminal Law Article, Sect. 6-218 deals with "credit against sentence for time spent in custody." The Maryland law governing the credit due on a sentence for time already spent in detention dates to 1974 when the legislature enacted Sect. 638C of Article 27. Our current Sect. 6-218 of the Criminal Procedure Article was taken "without substantial change" from Article 27, Sect. 638C in 2001. In <u>Wilson v. Simms</u>, 157 Md. App. 82, 94, 849 A.2d 88 (2004), Judge James Eyler summed up that legislative provenance:

> In 2001, the legislature enacted § 6-218 of the Crim. Pro. Article, without substantive change from § 638C of Article 27. 2001 Laws of Maryland, Chapter 10. In 1974, the legislature enacted § 638C of Article 27 for the purpose of providing that, under certain circumstances, persons shall receive credit against their sentences for any time spent in custody. 1974 Laws of Maryland, Chapter 735, § 1.

*See also* <u>Fleeger v. State</u>, 301 Md. 155, 159-60, 482 A.2d 490 (1884).

Subsection 6-218(b)(1) covers the circumstances present during the appellant's first sub-period of incarceration:

> (b)(1) <u>A defendant</u> who is convicted and sentenced <u>shall receive credit</u> against and a reduction of the term of a definite or life sentence, or the minimum and maximum terms of an indeterminate sentence, <u>for all time spent in the custody of a correctional facility</u>, hospital, facility for persons with mental disorders, or other unit <u>because of</u>:
>
> > (I) <u>the charge for which the sentence is imposed</u>; or

18

(II) the conduct on which the charge is based.

(Emphasis supplied.)

Credit for time spent in custody pursuant to subsection (b)(1) is mandatory. As Wilson v. Simms, 157 Md. App. at 95, explained:

> Subsection (b)(1) addresses those situations where a defendant is in custody before trial and is subsequently convicted on the charge for which he was held. The time spent in custody prior to the imposition of sentence must be credited against the sentence imposed.

(Emphasis supplied.)

Accordingly, Judge Wilkinson awarded the appellant credit for 1,169 days, the time running from June 19, 2018 to August 30, 2021. All parties agree that that crediting was appropriate. The second sub-period of time, the 184 days running from August 30, 2021 to March 2, 2022, presents a very different picture. It is controlled by Section 6-218(b)(3), which provides:

> (3) In a case other than a case described in paragraph (2) of this subsection, the sentencing court may apply credit against a sentence for time spent in custody for another charge or crime.

(Emphasis supplied.)

**An Exercise Of Discretion**

From August 30, 2021 forward, the day in which the appellant entered his guilty plea for the totally unrelated assault on a fellow prisoner, the appellant was in custody for two completely distinct purposes. He was, to be sure, still in custody pending the outcome of the present case. That, however, was not the only basis for his custodial status. He was already in the process of serving his actual sentence for the unrelated prison assault. He

19

could quite legitimately have been serving that prison sentence even if the current crime against him had never been filed.

Giving the appellant credit for those final 184 days, therefore, would have been giving the appellant double credit for that period of time. The net effect would have been that for at least that period of 184 days, the ultimate sentence for second-degree murder and the sentence for the prison assault would in net effect have been served concurrently. Pursuant to subsection (b)(3), such concurrent sentencing, to wit, such "double crediting," is a legitimate sentencing option. It is, however, by no means mandatory.

Judge Wilkinson recognized this sentencing option. At the March 2, 2022 sentencing, he announced:

> I'm going to grant Mr. Martin-Dorm credit for time served. And I calculate that time served as being 1,169 days. That's calculated from, you might want to write this down, June 19, 2018 to August 30, 2021. August 30, 2021 is the day that he plead guilty to the Second-Degree Assault in the Detention Center and began serving that sentence. I don't know that he can get double credit when he's serving that sentence for this sentence. So, he gets credit of 1,169 days on this case. The sentence here will be consecutive to the Second-Degree Assault case that is C-21-CR-25-71.

(Emphasis supplied.)

Judge Wilkinson made it very clear that he wanted the two formal sentences to be consecutive and not concurrent. The sentence that Judge Wilkinson handed down, including the awarding of credit for time served prior to August 30, 2021 but denying credit for time served after August 30, 2021, was completely legal and was not in any way an abuse of discretion. Judge Wilkinson had the discretionary authority both to award credit and to deny credit in precisely the way that he did. The appellant does not even argue that

20

the actual exercise of discretion in this case was an abuse of discretion. The appellant attempts to construct the argument that Judge Wilkinson failed to exercise discretion from a single sentence in the judge's remarks:

> Here, when the judge said, "I don't know that he can get double credit when he's serving that sentence for this sentence" the judge failed to exercise his discretion. *See* Wilson, 157 Md. App. at 95. A failure to exercise discretion is an abuse of discretion. Brown, 470 Md. at 553. Failure of a court to recognize or exercise its discretion for whatever reason – is by definition not a proper exercise of discretion."

(Emphasis supplied.) The argument is that the judge could have given the appellant double credit if he had wanted to but seemed to believe that he was precluded from doing so.

The appellant attempts to build a castle in the sand. He takes the single sentence, "I don't know that he can get double credit when he's serving that sentence for this sentence," and attempts to read into it a failure on the part of the judge to understand the full thrust of the law. It is as if the appellant were demanding, as a prerequisite to the judge's discretionary decision not to give double credit, the additional clarifying reassurance from the judge, "But if I wanted to give the appellant double credit, which I don't, Sect. 6-218 (b)(3) would at least have permitted me to do so." To the extent to which the judge was in any doubt, we read his remarks as saying implicitly:

> I am not disposed to grant this defendant "double credit." I basically don't want to and I don't think the law requires me to; that's why, on the larger question, I am making the current sentence consecutive to rather than concurrent with that other unrelated sentence. A concurrent sentence is, ipso facto, a case of awarding double credit and I don't want to give this defendant the benefit of double credit in any respect.

21

In this case, Judge Wilkinson clearly exercised his discretion by denying the appellant the 184 days of credit for that period where the two sentences overlapped. He did not decline to decide the question. He decided it.

Judge Wilkinson's correct surmise was that in circumstances such as those at this sentencing hearing, the granting of double credit is not mandatory. That is absolutely correct. The judge offered an opinion as to nothing else. Albeit not mandatory, the awarding of double credit in these circumstances is nonetheless permissible. It is entrusted to the discretion of the sentencing judge. In that case, Judge Wilkinson exercised his discretion to deny the appellant any such double credit.

There is no way that the appellant can now reformulate that discretionary decision into a failure to exercise discretion. Even if a discretionary decision were based on an incorrect or inadequate understanding of the law, it would still be vulnerable to attack as an abuse of discretion that was exercised but not as a non-exercise of discretion. Even a bad discretionary decision, however, is not the same thing as a discretionary non-decision. Even an inadequately reasoned discretionary decision, moreover, can sometimes turn out to be a lucky guess. It thereby enjoys a decided advantage over a non-decision. They are not the same.

If the appellant, in trying to construct a sophisticated argument out of a single and arguably ambiguous sentence, is suggesting that the words, "I don't know that…" are enough to cast doubt, if not doom, on the judge's ability to stand up and to deliver a 20-minute lecture to a law school class on the "Intricacies of Awarding Credit for Time Served," such a lofty prerequisite for the exercise of discretion simply does not exist and

has never been suggested. King Solomon-like omniscience is not a prerequisite to the exercise of discretion. A judge is not required to pass an academic qualifying test on a subject before exercising discretion with respect to that subject. If such an unrealistic standard did exist, exercises of discretion, even by judges, would frequently not pass muster. The appellant cannot construct a case simply by casting or suggesting doubt.

In any event, the appellant conveniently forgets the basic tiebreaker if any doubt about the judge's legal competence to make a discretionary call should exist. The appellate tiebreaker is that the trial judge is presumed to have done the right thing for the right reason. The burden is cast on an appellant to rebut that presumption and to prove otherwise. In this case, he has not remotely done so. We are deferential, not hypercritical, particularly with respect to exercises of discretion.

### Non-Preservation Again

In addition to its lack of substantive merit, however, this fourth contention is twice bereft. Its merits (or demerits), whatever they may be, are not properly before us. After Judge Wilkinson concluded passing sentence on the appellant, including the granting and the denying of credit for time served, there was neither a peep nor murmur of protest or objection or even questioning. Ordinarily, an appellate court will not decide any issue unless it plainly appears by the record to have been raised in or decided by the trial court. Md. Rule 8-131(a). *See* Reyes v. State, 257 Md. App. 596, 636 n.23 (2023). Here, the trial waters were completely unruffled. The appellant was apparently content. For the second time in four contentions, the appellant's current objection has not been preserved for appellate review. That could and should end the matter.

23

## The Notice Of Plain Error Again:
## An Appellate Mulligan

Also for the second time in four contentions, however, the appellant seeks yet again to litigate at the appellate level an entirely different case than the one he actually tried in the circuit court. He again asks us to overlook non-preservation by taking notice of plain error. Once again, this effort to resuscitate an otherwise disqualifying procedural lapse will not prevail. The preservation requirement is a vital part of the trial process and will not be cavalierly or blithely by-passed. A criminal trial is not a round of golf and the harsh reality is that the player who muffs an easy shot below is not automatically, or even presumptively, entitled to an appellate Mulligan. In any event, the overwhelming probability is that the muffed shot will not be replayed. That is because the notice of plain error is such a rare phenomenon. The record is what it is and the record can be unforgiving. In the exercise of our discretion, we decline the request to take notice of plain error. That could and should end the matter.

Our chagrin at the increasingly casual invocation of the plain error doctrine, however, compels us to repeat our stern admonition in Morris v. State, 153 Md. App. 480, 507, 837 A.2d 248 (2003), cert. denied, 380 Md. 618, 846 A.2d 402 (2004):

> Appellate invocation of the "plain error doctrine" 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.

A cry for plain error is little more than a shout into a daunting headwind.

We cannot imagine what strange and exotic fascination the appellant thinks that the subject of sentencing credit for time served might have to trigger this "rare, rare

phenomenon."[2] The critical question is not "Can we?" but "Why would we wish to?" That is the obvious question the supplicant needs to ask and answer, but almost never does. We can only conclude as we did under similar circumstances in Garner v. State, 183 Md. App. 122, 152, 960 A.2d 649 (2008), aff'd, 414 Md. 372, 995 A.2d 694 (2010):

> The frequency with which we are called upon to throw the life preserver of plain error to sinking (and eminently sinkable) contentions is almost a litigational scandal. It is as if appellate preservation had become an anachronistic embarrassment. We know, of course, that the possibility of plain error is out there, and on a rare and extraordinary occasion we might even be willing to go there. One must remember, however, that a consideration of plain error is like a trip to Angkor Wat or Easter Island. It is not a casual stroll down the block to the drugstore or the 7-11. The exaggerated cry of alarm in this case evokes no echo of Angkor Wat or Easter Island.

(Emphasis supplied.)

### A Far-Flung Peripheral Issue:
### Ineffective Assistance Of Counsel

The appellant now claims that counsel's failure at sentencing to object to Judge Wilkinson's denial of 184 days of credit for time served was a lawyerly mistake so blatant as to cry out for immediate and obvious redress pursuant to the Sixth Amendment. Even while acknowledging that, pursuant to Testerman v. State, 170 Md. App. 324, 336, 907 A.2d 294 (2006), a post-conviction procedure hearing is a more appropriate forum for

---

[2] Do not be misled by the phrase "strange and exotic fascination." This is just breezy shorthand for the fact that the notice of plain error is not routine procedural relief. There must be compelling reasons to make an appellate court wish to exercise its discretionary option, such as a blatant miscarriage of justice, an unfair impact on a defendant, serious lawyerly dereliction, the desire of the court to use the case as a vehicle. An in-depth discussion of these compelling reasons may be had at Austin v. State, 90 Md. App. 254, 267-72, 600 A.2d 1142 (1992). *See also* Williams v. State, 34 Md. App. 206, 211, 366 A.2d 399 (1976).

examining and for resolving assistance of counsel claims, the appellant relies on <u>Testerman</u> for its acknowledgment of the available alternative that "where the critical facts are set in dispute and the record is sufficiently designed to present a fair evaluation of the claim, there is no need for a collateral fact-finding proceeding, and review on direct appeal may be appropriate and desirable." In <u>Testerman</u> the failure to object had been to a ruling absolutely central to the defendant's conviction. It had been a failure to object to the trial judge's ruling at the end of the case that the State's evidence had been legally sufficient to support the conviction.

This effort to attract the attention of a direct appeal to such a far-flung peripheral issue is about as effective as a castaway's setting adrift of a message in a bottle. The appellant raises this final sub-contention to his fourth contention very summarily. We will answer it equally summarily. <u>Testerman v. State</u> does indeed state the universally recognized norm for handling ineffective assistance of counsel claims and the appellant does not even suggest why we should not follow the norm:

> Generally a post-conviction proceeding is the "most appropriate" way to raise a claim of ineffective assistance of counsel because ordinarily the trial record does not illuminate the basis for the challenged acts or omissions of counsel.

*See also* <u>Mosley v. State</u>, 378 Md. 548, 558-59, 836 A.2d 678 (2003); <u>In re Parris W.</u>, 363 Md. 717, 726, 770 A.2d 202 (2001); <u>Lettley v. State</u>, 358 Md. 26, 32, 746 A.2d 392 (2000); <u>Steward v. State</u>, 218 Md. App. 550, 570, 98 A.3d 362 (2014). We will leave this sub-contention for possible post-conviction petition hearing review.

## A Curious Juxtaposition

Even in dismissing this sub-contention summarily, we must, however, take note of one glaring curiosity. In this sub-contention, the appellant now claims that his trial counsel was ineffective for neglecting to preserve for appellate review what is now the basis for this fourth contention. Ironically, the same trial counsel similarly neglected to preserve for appellate review what is now the basis for his third contention. There has been, however, no claim of inadequacy of counsel with respect to that essentially indistinguishable act of non-preservation.

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984) is the universally acknowledged Ur-Text for all effectiveness of counsel claims, state or federal. All effectiveness of counsel claims are subjected to Strickland's two-pronged test – the performance prong and the prejudice prong.[3]

Looking for a moment at Strickland's prejudice prong, the possible prejudice being challenged under the unpreserved third contention would seem to have been the very conviction itself with its 40 year sentence. By contrast, the possible prejudice emanating from the unpreserved fourth contention is 184 days of possible double credit on the basic sentence for time being served on a separate sentence. 40 years versus 184 days. Why would one opt for a grand strategy that might produce, at best, a resentencing hearing (with

---

[3] The appellant makes no mention of Strickland v. Washington or of any other case, state or federal, touching on the subject of inadequacy of counsel. It casts some doubt on how serious the appellant is in adding to the appeal this sub-contention of a sub-contention. He will, however, have the opportunity to develop his argument more fully by way of a post-conviction procedure petition.

only 184 days at stake) rather than an alternative (or additional) strategy that might produce a retrial of the entire case? We find it curious that one should challenge the lesser alleged error while giving a free pass to the greater. In view of the overarching reality, however, that the ineffectiveness of counsel sub-contentions would be going nowhere in either context, it really does not make any difference.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**